Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Blythe C. Miller, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY, and GEICO                              Docket No.:_____ (          )
CASUALTY COMPANY,

                        Plaintiffs,

        -against-                                                           **Plaintiff Demands a Trial by
Jury**

JONATHAN LANDOW, M.D.,
PARAMOUNT MEDICAL SERVICES, P.C.,
PREFERRED MEDICAL, P.C.,
SOVEREIGN MEDICAL SERVICES, P.C.,
BIRCH MEDICAL & DIAGNOSTIC, P.C.,
SPRUCE MEDICAL & DIAGNOSTIC, P.C.,
SUMMIT MEDICAL SERVICES, P.C.,
EASTERN MEDICAL PRACTICE, P.C.,
MACINTOSH MEDICAL, P.C.,
and JOHN DOE DEFENDANTS "1-10",

                        Defendants.
-------------------------------------------------------------------X

## <u>COMPLAINT</u>

     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the defendants, Jonathan Landow, M.D.,

Paramount Medical Services, P.C., Preferred Medical, P.C., Sovereign Medical Services, P.C., Spruce Medical & Diagnostic, P.C., Birch Medical & Diagnostic, P.C., Summit Medical Services, P.C., Eastern Medical Practice, P.C., Macintosh Medical, P.C., and John Doe Defendants "1-10", (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $3,900,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges through Paramount Medical Services, P.C. ("Paramount"), Preferred Medical, P.C. ("Preferred"), Sovereign Medical Services, P.C. ("Sovereign"), Spruce Medical & Diagnostic, P.C. ("Spruce"), Birch Medical & Diagnostic, P.C. ("Birch"), Summit Medical Services, P.C. ("Summit"), Eastern Medical Practice, P.C. ("Eastern"), Macintosh Medical, P.C. ("Macintosh")(collectively "PC Defendants"), as part of a massive scheme to exploit New York's no-fault insurance system. The PC Defendants purport to be legitimate professional corporations, but they operate on a transient basis, maintain no stand-alone practices, have no patients of their own, and provide no legitimate or medically necessary services.

2.     Jonathan Landow, M.D. ("Landow") spearheaded the scheme to defraud GEICO by using the PC Defendants to bill for a myriad of medically unnecessary and excessive healthcare services, including purported initial and follow-up examinations, outcome assessment testing, nerve conduction velocity ("NCV") testing, electromyography ("EMG") studies (NCV and EMG are collectively referred to as "EDX testing"), interventional pain management procedures, including various injections, Localized Intense Neurostimulation Therapy and Trigger Point Impedance Imaging ("LINT/TPII Treatment"), acupuncture treatment, physical therapy treatment and surgical services, including but not limited to platelet-rich plasma ("PRP") injections and

arthroscopic surgeries (collectively referred to hereinafter as the "Fraudulent Services"), allegedly provided to individuals who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO New York no-fault insurance policies ("Insureds").

3. Landow, along with John Doe Defendants "1"-"10", perpetrated the fraudulent scheme using illegal referral, financial and kickback arrangements to permit the PC Defendants to access a steady stream of patients from dozens of No-Fault Clinics in the New York City area, fraudulently bill GEICO, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4. GEICO seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $12,750,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of the PC Defendants because:

(i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(ii) the Defendants were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, including, but not limited to, engaging in illegal kickback or other financial arrangements involving Defendants and others and improper self-referrals, and as a result, were not eligible to receive no-fault reimbursement in the first instance;

(iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iii) Landow does not actually practice medicine through the PC Defendants and, therefore, the PC Defendants are ineligible to recover no-fault benefits; and

(iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants, and therefore were not reimbursable.

5. The Defendants fall into the following categories:

(i)     The PC Defendants are a series of interchangeable New York medical professional corporations through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including GEICO.

(ii)     Landow is a physician living in Florida, but licensed to practice medicine in New York, who purports to own the PC Defendants.

(iii)     John Doe Defendants "1"-"10" are individuals who furthered the fraudulent scheme perpetrated against GEICO by, among other things, referring Insureds to the PC Defendants in exchange for kickbacks or other payments from the Defendants, oversaw the pre-determined fraudulent protocols at the various No-Fault Clinics used to maximize profits without regard to genuine patient care and engaged in illegal referral arrangements with the Defendants and others.

6.     The Defendants' scheme continues uninterrupted to the present day. As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the Defendants were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, including, but not limited to, engaging in illegal kickback or other financial arrangements involving Defendants and others and improper referral arrangements, including illegal self-referrals; (iii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to GEICO; (iv) Landow does not actually practice medicine through the PC Defendants; and (v) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the PC Defendants, and therefore were not reimbursable.  To this day, Defendants seek to collect on unpaid billing through the filing of thousands of individual litigations and arbitrations, knowing, the services were not reimbursable in the first instance.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed through the PC Defendants to GEICO. The charts annexed hereto as Exhibits "1" – "8" sets forth a large, representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted through the PC Defendants to GEICO.

8.      The Defendants' fraudulent scheme continues uninterrupted through the present day, as the PC Defendants continue to seek collection on pending charges for the Fraudulent Services. As a result of the Defendants' interrelated fraudulent schemes, GEICO has incurred damages of more than $3,900,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

#### A.     Jonathan Landow

10.     Defendant Landow resides in Florida. Landow was licensed to practice medicine in New York on September 1, 1988. Landow purportedly owns and controls the PC Defendants, does not practice medicine through the PC Defendants and caused billing for the Fraudulent Services to be submitted to GEICO and other insurers.

11.     Since the early 2000s, Landow has a history of involvement in no-fault insurance fraud schemes, in which he has engaged in illegal kickbacks and referral arrangements and used

his professional corporations as vehicles to submit fraudulent no-fault insurance billing to automobile insurers.

12.     For a period of time, Landow stopped billing insurers, including GEICO for services provided to no-fault insureds.  However, after a series of decisions that rendered Landow vulnerable to significant financial repayments to the U.S. Government and others, in 2016, Landow again began billing insurers through the PC Defendants (most of which were incorporated over a decade before), including GEICO seeking reimbursement for services billed to no-fault insureds. See e.g.  Landow v. Commissioner of Internal Revenue, 2011 T.C. Memo 177 (U.S. Tax Court, 2011); Landow v. Wachovia Securities, et al., 966 F. Supp2d 166 (E.D.N.Y. 2013); Carbon Capital Mgt., LLC v American Express Co., 2010 NY Slip Op 30477(U) (Sup. Ct. Nassau Cty. 2010); Bronte SPV, LLC. v. Jonathan Landow, et al., 601591/2017 (Sup. Ct. Nassau Cty. 2017).

13.     Owing significant repayment to the U.S. Government, among others, Landow once again began billing for services performed on no-fault insureds.  Needing to raise significant capital and funds, in 2016, Landow began rendering services through various entities he purported to own, providing a variety of medical services.  However, the services provided appeared to be nothing more than services provided for financial gain and at the expense of patient care.  To that end, Landow was named as a defendant in no-fault fraud action entitled GEICO, et al. v. Empire Medical Services, P.C., et al., Docket No. 18-CV-2956(BMC), where GEICO claimed that Landow through two companies he owned, was engaged in a scheme to defraud GEICO through the performance of medically unnecessary EMG/NCV testing based on improper financial arrangements which allowed him access to various medical clinics.

14.     Landow was also susceptible to spearheading the Fraudulent Scheme as based on other financial deals he entered, which resulted in Landow being named as a defendant in an action

to recover millions of dollars.  See Qwil PBC, et al., v. Jonathan Landow, et al., 653605/2019 (Sup. Ct. New York Cty).  In Qwil, the plaintiffs, a funding company and billing company, Enter, Inc, with whom Landow entered into various agreements with to advance funds and act as a billing company for some of his entities, allege that Landow, Paramount, Preferred and Sovereign were in breach of contract and owe over $2,000,000.00 in funds that had been advanced by plaintiffs based on the purported sale of receivables to plaintiffs. During the course of the litigation, Plaintiffs alleged that Landow violated court orders and fraudulently transferred money to family members in order to evade collection.

**B.      The PC Defendants**

15.    Paramount is a New York professional corporation incorporated on or about December 19, 2011, with its principal place of business in New York, and purports to be owned and controlled by Landow.  Paramount has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

16.    Preferred is a New York professional corporation incorporated on or about February 3, 2009, with its principal place of business in New York, and purports to be owned and controlled by Landow.  Preferred has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

17.    Sovereign is a New York professional corporation incorporated on or about May 26, 2010, with its principal place of business in New York, and purports to be owned and controlled by Landow.  Sovereign has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

18.    Spruce is a New York professional corporation incorporated on or about October 4, 2002, with its principal place of business in New York, and purports to be owned and controlled

by Landow. Spruce has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

19. Birch is a New York professional corporation incorporated on or about October 4, 2002, with its principal place of business in New York, and purports to be owned and controlled by Landow. Birch has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

20. Summit is a New York professional corporation incorporated on or about May 4, 2008, with its principal place of business in New York, and purports to be owned and controlled by Landow. Summit has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

21. Eastern is a New York professional corporation incorporated on or about December 11, 1997, with its principal place of business in New York, and purports to be owned and controlled by Landow. Eastern has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

22. Macintosh is a New York professional corporation incorporated on or about October 4, 2002, with its principal place of business in New York, and purports to be owned and controlled by Landow. Macintosh has been used by Landow as a vehicle to submit fraudulent billing to GEICO and other insurers.

## JURISDICTION AND VENUE

23. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

24.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

25.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

26.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is a District where a substantial amount of the activities forming the basis of the Complaint occurred.

27.     For example, in addition to the majority of the Fraudulent Services being performed within the Eastern District, the Defendants submitted or caused to be submitted a massive amount of fraudulent billing to GEICO under New York automobile insurance policies, for treatment that they purported to provide to GEICO's New York-based Insureds. In reliance on the fraudulent claims, personnel at a GEICO office in the Eastern District of New York issued payment on the fraudulent claims.

<u>**ALLEGATIONS COMMON TO ALL CLAIMS**</u>

28.     GEICO underwrites automobile insurance in New York.

**I.      <u>An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement</u>**

29.     New York's no-fault insurance laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

30.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R.

§§ 65, et seq.), automobile insurers are required to provide no-fault insurance benefits ("Personal Injury Protection" benefits or "PIP Benefits") to Insureds.

31.     In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

32.     In New York, an Insured can assign his/her right to PIP Benefits to healthcare goods and services providers in exchange for those goods and services.

33.     In New York, pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

34.     In the alternative, in New York a healthcare provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form" or "CMS-1500 form").

35.     Pursuant to the New York no-fault insurance laws, healthcare providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services, or if they fail to meet the applicable licensing requirements in any other states in which such services are performed.

36.     For instance, the implementing regulation adopted by the New York Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

37.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

38.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

39.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See e.g., New York Education Law §6512, §6530 (11), and (19).

40.     Furthermore, New York law prohibits licensed healthcare service providers, including physicians, from referring patients to healthcare practices in which they have an ownership interest, investment interest or compensation arrangement unless: (i) the ownership interest, investment interest or compensation arrangement is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available". See New York Public Health Law § 238-d.

41.     Additionally, New York law requires the shareholders of a professional corporation to be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. <u>See</u>, <u>e.g.</u>, N.Y. Business Corporation Law § 1507.

42.     Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive PIP Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, or if it pays or receives unlawful compensation in exchange for patient referrals.

43.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect PIP Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

44.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect PIP Benefits. There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

45.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services. Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from

an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

46.　In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

47.　When a healthcare provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

48.　Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.　The Defendants' Fraudulent Scheme

### A.　Overview of the Scheme

49.　As noted above, upon facing financial insolvency, Landow needed an infusion of cash and beginning in 2016, Landow used the PC Defendants as concurrent and/or successive interchangeable entities to submit millions of dollars of billing for the Fraudulent Services to GEICO (and other insurers).

50.　Landow knew, the Fraudulent Services billed through the PC Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to

pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the illegal financial, kickback and other arrangements between the Defendants and others, including the individuals who controlled the various No-Fault Clinics where the PC Defendants operated.

51.     Since 2016, and continuing uninterrupted to the present day, Landow has used the PC Defendants as interchangeable entities that have operated in some instances concurrently and/or in succession to perpetrate the fraud. The continued "flipping" of corporate entities used to submit billing to GEICO was nothing more than an attempt to circumvent GEICO's (and other insurers) investigations in the practices and procedures of the billing entities in an effort to receive reimbursement for knowing unreimburseable Fraudulent Services.

52.     While some PC Defendants would operate concurrently and from the same treatment location, when Landow caused a new entity to begin operating, it was routinely from the same locations after the change in name and TIN number. However, other than the nominal change, there was no difference in the services rendered or financial arrangements which allowed the entities to operate at the various treatment locations.

53.     Defendants' pre-determined treatment protocol exploited Insureds' No-Fault Benefits by: (i) enriching the Defendants rather than legitimately treating patients according to their true, individual needs; (ii) falsely "justifying" the Fraudulent Services performed by the Defendants; (iii) using the pre-ordained "findings" of the Fraudulent Services to allow the healthcare providers (and others) who rendered services from the No-Fault Clinics to continue to provide medical services to GEICO insureds; and (iv) performing the Fraudulent Services pursuant to improper kickback and financial arrangements between the Defendants and others, and in certain instances pursuant to improper self-referrals.

## B.    The Illegal Kickback and Referral Relationships

54.    Landow did not operate any of the PC Defendants at any single, fixed location. Rather, he caused the PC Defendants to operate (in successive and/or concurrent order) from numerous locations in the New York City area.

55.    Landow did not market the existence of any of the PC Defendants to the general public.

56.    Landow did not advertise for patients, never sought to build name recognition, as evidence by the fact that in approximately four years he has utilized 8 different PC Defendants to render services and submit billing to GEICO, or make any legitimate efforts of his own to attract patients on behalf of any of the PC Defendants.

57.    Landow did not have his own patients, and did nothing to create a patient base. Rather the patients were those of the clinics where the PC Defendants operated.

58.    When Landow caused a PC Defendant to begin operating at a No-Fault Clinic, he never paid any money to "purchase" the prior medical practice for whom he was taking over and presumably obtaining its patient base.

59.    Landow did virtually nothing that would be expected of the owner of legitimate medical professional corporations to develop their reputation and attract patients.

60.    Landow, instead, operated the PC Defendants on an itinerant basis from over twenty various "No-Fault" medical clinics, primarily located in Brooklyn, Queens, and Bronx, where the Defendants received steady volumes of patients through no efforts of their own, including, but not limited to the following clinics (the below clinics and any other clinic where the Defendants performed services are collectively referred herein as, the "Clinics"):

- 3910 Church Avenue, Brooklyn;
- 2940 Grand Concourse, Bronx;

- 332 E. 149th Street, Bronx;
- 430 W. Merrick Road, Valley Stream;
- 1120 Morris Avenue, Bronx;
- 82-25 Queens Boulevard, Elmhurst;
- 4014 Boston Road, Bronx;
- 599 Southern Boulevard, Bronx;
- 513 Church Avenue, Bronx;
- 1220 E. New York Avenue, Brooklyn;
- 139 North Central Avenue, Valley Stream;
- 152-90 Rockaway Boulevard, Jamaica;
- 1568 Ralph Avenue, Brooklyn;
- 2 Wilson Place, Mount Vernon;
- 222-01 Hempstead Avenue, Queens Village;
- 615 Seneca Avenue, Brooklyn;
- 800 St. Ann's Avenue, Bronx;
- 492 Lefferts Avenue, Brooklyn;
- 1767 Southern Boulevard, Bronx;
- 2379 Ralph Avenue, Brooklyn;
- 2386 Jerome Avenue, Bronx;
- 240-19 Jamaica Avenue, Bellerose;
- 3407 White Plains Road, Bronx.

61.     This list of Clinics above is not exhaustive.  The Defendants operated from various other No-Fault clinics in the New York City area.

62.     The Clinics, though ostensibly organized to provide a range of medical services to Insureds at a single location, are in many cases actually set up as convenient, one-stop shop for no-fault insurance fraud.

63.     The Clinics provided facilities for the Defendants, as well as a "revolving door" of numerous other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

64.     In fact, GEICO received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another;

and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of the no-fault insurance system.

65.     By way of example, GEICO received billing for purported healthcare services rendered at the 3910 Church Avenue, Brooklyn Clinic from a "revolving door" of more than 60 purportedly different healthcare providers.  In fact, many of the medical providers at that location were named as defendants in a federal RICO action where GEICO credibly alleged that the location was owned and controlled by laypersons and the medical providers performed medically unnecessary services based on the improper financial (and other) relationships among the defendants and laypersons.  See Government Employees Insurance Co., et al., v. East Flatbush Medical, P.C., et al., 20-CV-1695 (MKB)(PK).

66.     In East Flatbush, GEICO obtained information which supported allegations that the laypersons controlling the clinic also controlled certain treatment protocols, directed how prescriptions for pharmaceuticals and durable medical equipment were dispensed and routinely fabricated medical records and prescriptions (similar to the ones the PC Defendants that operated from 3910 Church Avenue would issue) to inflate costs and increase billing submitted to GEICO.

67.     Similarly, GEICO received billing for purported healthcare services rendered at the 492 Lefferts Avenue Brooklyn Clinic from a "revolving door" of more than 40 purportedly different healthcare providers.  As with the 3910 Church Avenue Clinic, GEICO obtained information which supported allegations that the laypersons controlling the 492 Lefferts Avenue Clinic also controlled certain treatment protocols, directed how prescriptions for durable medical equipment were dispensed and routinely fabricated medical records and prescriptions (similar to the ones the PC Defendants that operated from 492 Lefferts Avenue Brooklyn would issue) to inflate costs and increase billing submitted to GEICO.

68.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, cultivated and controlled the patient base at the Clinics.

69.     The Clinics directed Insureds to the Defendants for purported examinations, often serving as "Gateway" examinations in order to receive referrals and recommendations for the other medical services provided at the clinics, in exchange for payments from and/or on behalf of the Defendants, regardless of the Insureds' individual symptoms, presentation or even total absence of any medical problems arising from any automobile accident.  Thereafter, the PC Defendants were also allowed to perform and bill for certain other Fraudulent Services, based on the amount of payments the Defendants made to the owners/operators and others.

70.     Landow, in order to obtain access to the Clinics' patient base (i.e., Insureds), entered into illegal kickback and financial arrangements with licensed and/or unlicensed persons, including John Doe Defendants "1" – "10", who "brokered" or "controlled" patients that were treated, or who purported to be treated, at the Clinics.

71.     For example, Landow testified at numerous Examinations Under Oath ("EUO") that the patients treated by the PC Defendants did not come to the PC Defendants based on any advertising or marketing he performed.  Therefore, he did not think of the patients as his or the PC Defendants, but rather the patients were those of the Clinics.

72.     Landow (or any medical professional rendering services on the PC Defendants' behalf) had no genuine doctor-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with the PC Defendants specifically.  Instead, the Insureds were simply directed by the Clinics, and the unlicensed persons associated therewith, to subject themselves to treatment by whatever individual was working for the PC Defendants that day and the other medical providers on that given day, because of the kickbacks paid by the Defendants.

73.     In fact, numerous individuals were recently indicted for paying monies to hospitals, medical providers and others for confidential patient information who would then be contacted and steered to medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey who paid these individuals kickbacks in exchange for the referrals.   Upon information and belief, patients were steered to some of the treatment locations where the PC Defendants operated.   See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(SDNY 2019).

74.     The Clinics had no legitimate reason to refer Insureds to the Defendants since the Defendants provided no legitimate or necessary healthcare services to the Insureds.

75.     The Defendants gained access to Insureds at the Clinics because they made payments to individuals who own and/or control the Clinics.

76.     The payments paid or caused to be paid by Landow and the Defendants to the Clinic owners/operators (and others) were disguised as ostensibly legitimate fees to "lease" space.

77.     The financial arrangements that the Defendants entered into included the payment of fees ostensibly to "rent" space or personnel from the Clinics or fees for ostensibly legitimate services such as marketing, advertising, consulting, billing, transportation, and collection services.  In fact, however, these were "pay-to-play" arrangements that caused unlicensed laypersons to steer Insureds to the Defendants for medically unnecessary services at the Clinics.

78.     Although the Defendants entered into purported, boilerplate "leases" relating to the Clinics, the lease arrangements called for payments that were not reflective of the fair market value for leasing a tiny portion of space and/or non-exclusive space that was shared with numerous other healthcare providers in the Clinics; were based on the number of services that could be performed at a given location; and because the referrals of Insureds to the Defendants at the Clinics were done

even though the Fraudulent Services never played a genuine role in the treatment or care of the Insureds.

79.     In fact, the payments for "rent" were not fair market value, but rather tied directly to the number of patients the Defendants could "treat" at a clinic location.  For example, Landow testified at multiple EUOs stating that rather than a fair market value, Landow pays "rent" based on the number of patients who receive services from the PC Defendants.

80.     Critically, Landow testified: (i) he will first enter trial periods at a clinic before entering into a lease agreement.  Meaning he will not pay rent until he knows there is a significant number of patients at a location; and (ii) rent payments will adjust according to the number of services that can be provided at a clinic location, not necessarily the amount of space being used by Landow.  For example, if a PC Defendant is allowed by the clinic controller/owner to perform pain management services in addition to examinations, then the "rent" would increase.

81.     Highlighting the fraudulent nature of the purported lease agreements entered into by the Defendants, Landow testified at an EUO on behalf of Macintosh, which renders services at the 3910 Church Avenue Clinic, that he entered into a "lease" agreement in early 2020 for use of space at the 3910 Church Avenue Clinic with an entity NYC Community Medical Care, P.C., purportedly owned by Ataul Chowdhury, M.D.  ("Chowdhury") and who purportedly signed the lease.  A copy of the purported lease was provided to GEICO during the EUO.  However, Chowdhury advised GEICO, he did not have a lease at the 3910 Church Avenue Clinic, never saw the document before, never signed the document, and that his signature on the lease was forged.  Additionally, Chowdhury advised that he did not know who Landow or Macintosh were and had never met him.

82.     In addition to the kickbacks, as part of the "pay-to-play" arrangements that caused the owners/operators of the Clinics to provide the Defendants with access to Insureds, the Defendants referred the Insureds back to the other healthcare providers operating from the Clinics for continued chiropractic, physical therapy, and other healthcare services.

83.     Defendants made the payments in exchange for having the ability to bill for services at the various Clinics for the Fraudulent Services, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

84.     The unlawful kickback and referral relationships established between the Defendants and the Clinics were essential to the success of the Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships because without access to the Insureds, the Defendants would not have the ability to implement their fraudulent treatment and billing protocol, bill automobile insurers including GEICO, or generate income from insurance claim payments.

85.     The Clinics likewise benefitted from their unlawful relationships with the Defendants, not only because of the financial benefit conferred by the kickbacks themselves, but also because the fraudulent treatment reports and test results generated by the Defendants were then used to support the continuation of their own medically-unnecessary services to the Insureds.

86.     The Defendants would not have had access to the Clinics and the Insureds but for the payment of kickbacks to the owners and controllers of the Clinics.

87.     Absent the referrals from the healthcare providers and operators at the Clinics to the Defendants, the Defendants would have no reason to pay "rent" to the healthcare providers and operators at the Clinics.

88.     Landow at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

## C.     The Improper Self-Referrals Among Defendants

89.     In addition to the improper financial arrangements with the Clinics Controllers and others, Landow also cause patients to be "referred" from one PC Defendant to another in violation of New York Public Health Law § 238-d.

90.     In particular, Landow and certain PC Defendants routinely engaged in a pattern of self-referrals whereby Landow caused individuals to be referred for Fraudulent Services between the PC Defendants.  These self-referrals were designed to: (i) enrich the Defendants rather than legitimately treating patients according to their true, individual needs; and (ii) falsely "justify" the Fraudulent Services performed by the Defendants as well as healthcare services performed by the various healthcare providers (and others) who referred the patients to the Defendants for testing.

91.     Pursuant to New York Public Health Law § 238-d, practitioners, including chiropractors are prohibited from referring patients to healthcare practices in which he or she has an ownership or investment interest unless: (i) the ownership or investment interest is disclosed to the patient; and (ii) the disclosure informs the patient of his or her "right to utilize a specifically identified alternative health care provider if any such alternative is reasonably available."

92.     Based on the billing and documentation submitted to GEICO, there is no indication Landow or anyone associated with the Defendants ever disclosed Landow's simultaneous ownership of the PC Defendants to any Insureds, let alone informed the Insureds that they had the right to utilize a different health care provider than the PC Defendants who were treating the Insureds.

93.     Further, the self-referral relationship would not have been apparent to the Insureds because Landow, did not perform any of the services on behalf of the PC Defendants, employed numerous medical professionals, and technicians to perform the services on behalf of the PC Defendants and Insureds often were not even made aware of the name of the PC Defendant that provided the Fraudulent Services.

94.     The improper self-referral scheme typically involved:

(i)      One of the PC Defendants obtaining a patient pursuant to the improper financial arrangements between the Defendants and others;

(ii)     One of the PC Defendants performed an examination on an Insured;

(iii)    Landow then caused Insureds to be referred from one of the PC Defendants to another for purported electrodiagnostic testing, LINT, injections or other services; and

(iv)     Neither the Defendants nor any other healthcare providers associated with the Defendants disclosed Landow's ownership interest in the PC Defendants, in writing or otherwise.

95.     For example:

(i)      On or about April 9, 2018, Landow caused an Insured named FC to be referred from Paramount, which purported to provide the Insured with an initial examination, to Preferred for purported EDX testing. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Paramount or Preferred to the Insured.

(ii)     On or about April 12, 2018, Landow caused an Insured named KF to be referred from Paramount, which purported to provide the Insured with an initial examination, to Preferred for purported EDX testing. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Paramount or Preferred to the Insured.

(iii)    On or about September 13, 2018, Landow caused an Insured named EH to be referred from Paramount, which purported to provide the Insured with an initial examination, to Sovereign for purported LINT/TPII Treatment. ED would also receive EDX testing from Preferred. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Paramount, Sovereign, or Preferred to the Insured.

(iv)     On or about October 3, 2018, Landow caused an Insured named JN to be referred from Paramount, which purported to provide the Insured with an initial examination, to Sovereign for purported LINT/TPII Treatment. JN would also receive a trigger point injection from Birch. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Paramount, Sovereign, or Birch to the Insured.

(v)      On or about January 15, 2019, Landow caused an Insured named APF to be referred from Paramount, which purported to provide the Insured with an initial examination, to Spruce for purported EDX testing. APF would also be referred for trigger point injections from Birch and Eastern. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Paramount, Spruce, Birch, or Eastern to the Insured.

(vi)     On or about January 23, 2019, Landow caused an Insured named JU to be referred from Paramount, which purported to provide the Insured with an initial examination, to Spruce for purported EDX testing. JU would also receive trigger point injections from Birch. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Paramount, Spruce, or Birch to the Insured.

(vii)    On or about February 19, 2019, Landow caused an Insured named Todd Pringle to be referred from Birch, which purported to provide the Insured with an initial examination and a trigger point injection, to Spruce for purported EDX. At no point did Landow, Birch, or any other individual associated with the Defendants disclose Landow's ownership interest in Birch or Spruce to the Insured.

(viii)   On or about February 27, 2019, Landow caused an Insured named JA to be referred from Birch, which purported to provide the Insured with an initial examination, to Spruce for purported EDX testing and trigger point injections. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Birch or Spruce to the Insured.

(ix)     On or about March 25, 2019, Landow caused an Insured named CW to be referred from Birch, which purported to provide the Insured with an initial examination and a trigger point injection, to Spruce for purported EDX testing. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Birch or Spruce to the Insured.

(x)      On or about May 29, 2019, Landow caused an Insured named JS to be referred from Spruce, which purported to provide the Insured with an initial

examination and EDX testing, to Birch for a purported trigger point injection. JS would also receive a trigger point injection from Eastern. At no point did Landow or any other individual associated with the Defendants disclose Landow's ownership interest in Spruce, Birch, or Eastern to the Insured.

96. The Defendants benefitted financially from the improper Self-Referrals as it allowed them to perform multiple Fraudulent Services on Insureds, bill GEICO and generate income from insurance claim payments. At the same time, the voluminous list of medical services rendered to Insureds by healthcare providers at the No-Fault Clinics in connection with the fraudulent claims listed in Exhibits "1" - "8" where a self-referral occurred were enabled by the performance and pre-determined "findings" of the Defendants' medically unnecessary services.

**D.    Fraudulent Treatment Protocol**

97. Most Insureds who were treated by the PC Defendants were reportedly involved in relatively minor accidents. The majority of these Insureds suffered soft tissue injuries as a result of these reported accidents.

98. As discussed above, Defendants executed a complex fraudulent scheme designed to bill GEICO for the performance of the Fraudulent Services and subjected Insureds to a myriad of illusory and medically unnecessary healthcare services pursuant to a pre-determined fraudulent treatment and billing protocol, regardless of the severity of the accident or the nature of the Insured's injuries (or lack of any injuries), designed to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to it.

99. Each step in the fraudulent treatment and billing protocol implemented by the Defendants was designed to falsely reinforce the rationale for the previous step and provide a false

justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

100. No legitimate physician, clinic, pharmacist, pharmacy, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

101. However, Landow and the PC Defendants encouraged the medical professionals who rendered services on behalf of the PC Defendants to engage in fraudulent treatment and billing protocols as the medical professional's compensation was routinely tied to the number of procedures they performed and value of the billing for the services, versus a straight hourly or yearly salary. For example, Landow testified that certain professionals were paid on a "fee-for-service" schedule, meaning the employee was paid the greater of an hourly rate or the "fee-for-service" which would be based on the amount the individual generated in billing for the Defendants. This type of agreement results in services performed based on financial incentive, rather than true medical decision making or need.

102. The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants' focus was on exploiting the Insureds for profit rather than on legitimate patient care, and the Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers, pursuant to their illegal kickback and referral scheme.

103. In addition, in furtherance of the scheme and in an effort to evade insurer's investigations and disperse the amount of billing any one specific PC Defendant submitted to GEICO, Landow caused the PC Defendants to only bill for, and perform, certain Fraudulent Services.

## 1. The Fraudulent Initial Examinations

104.    Pursuant to the Defendants' pre-determined treatment and billing protocols — and pursuant to the improper financial arrangements, PC Defendants Paramount, Preferred, Birch, Eastern and Macintosh (collectively "Initial Examination Defendants") purported to perform initial medical examinations on the vast majority of the Insureds they treated.

105.    The initial examinations essentially were performed as a "gateway" in order to provide Insureds with pre-determined "diagnoses" to allow the Defendants to bill for the laundry list of other Fraudulent Services and as a springboard for other medical provider's services.

106.    To the extent that the initial examinations were conducted in the first instance, the Defendants made a boilerplate, pre-determined "diagnosis" for the Insureds, upon which the Defendants directed the Insureds to receive a pre-determined pattern of treatment, referrals, and recommendations to return for services at the Clinics from which the PC Defendants leased office space.

107.    Defendants typically billed the initial examinations to GEICO under current procedural terminology ("CPT") codes: (i) 99204 or (ii) 99203, both typically resulting in a charge of $148.69.

108.    The Initial Examination Defendants were not in compliance with relevant laws governing healthcare practice in New York and were not eligible to collect No-Fault Benefits in connection with any of the claims identified in Exhibits "1" – "8" for initial examinations, inasmuch the examinations were medically unnecessary and were performed – to the extent they were performed at all – as Landow and the PC Defendants gained access to Insureds at the No-Fault Clinics by paying kickbacks to individuals who own and/or control the No-Fault Clinics, in violation of the No-Fault Laws.

109. Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the severity of the Insureds' presenting problems and the nature and extent of the initial examinations.

110. According to the New York Workers' Compensation Medical Fee Schedule and New Jersey medical fee schedule (collectively, the "Fee Schedule"), which are applicable to claims for No-Fault Benefits, the use of CPT code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

111. The use of CPT code 99203 typically requires that the physician spend at least 30 minutes of face-to-face time with the Insured or the Insured's family.

112. Though the Initial Examination Defendants routinely billed for the initial examinations under CPT codes 99203 and 99204, no medical practitioner employed by or associated with Defendants ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 45 minutes. Rather, as confirmed by certain Insureds, the initial examinations rarely lasted more than 15 minutes, to the extent that they were conducted at all.

113. In keeping with the fact that the initial examinations could not have lasted more 30 or 45 minutes, the Initial Examination Defendants used boilerplate forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

114. All that was required to complete the boilerplate forms was a cursory patient interview and a cursory physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

115.    These interviews and examinations did not require any medical professional employed by or associated with the Initial Examination Defendants to spend more than 30 to 45 minutes of face-to-face time with the Insureds.

116.    According to the Fee Schedule, the use of CPT codes 99203 or 99204 typically requires that the Insured presented with problems of moderate or moderate-to-high severity.

117.    Though the Initial Examination Defendants routinely billed for the initial examinations under CPT codes 99203 or 99204, the Insureds did not present with problems of moderate or moderate-to-high severity as the result of any automobile accident. Rather, to the extent that the Insureds had any health problems at all as the result of any automobile accidents, the problems almost always were of low severity.

118.    Even though the Insureds almost never presented with problems of moderate or moderate-to-high severity as the result of any automobile accident, in the unlikely event that an Insured was to present with problems of moderate or moderate-to-high severity, the deficient initial examinations performed were incapable of assessing and/or diagnosing problems of such severity.

119.    In addition, according to the Fee Schedule, when the Initial Examination Defendants submitted charges for initial examinations under CPT code 99203, they represented that they: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "low complexity".

120.    According to the Fee Schedule, when the Initial Examination Defendants submitted charges for initial examinations under CPT code 99204, they represented that they: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

(i)    Misrepresentations Regarding "Comprehensive" and "Detailed" Patient Histories

121.    Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

122.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

123.    The CPT Assistant recognizes the following fourteen (14) organ systems with respect to a review of systems: (i) constitutional symptoms (e.g., fever, weight loss); (ii) eyes; (iii) ears, nose, mouth, throat; (iv) cardiovascular; (v) respiratory; (vi) gastrointestinal; (vii) genitourinary; (viii) musculoskeletal; (ix) integumentary (skin and/or breast); (x) neurological; (xi) psychiatric; (xii) endocrine; (xiii) hematologic/lymphatic; and (xiv) allergic/immunologic.

124.    When the Initial Examination Defendants billed for the initial examinations under CPT code 99204, they falsely represented that they took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations.

125.    In fact, no Initial Examination Defendant ever took a "comprehensive" patient history from the Insureds they purported to treat during the initial examinations, because they did not document a review of the systems directly related to the history of the patients' present illnesses or a review of 10 organ systems unrelated to the history of the patients' present illnesses.

126.    Rather, after purporting to provide the initial examinations, the Initial Examination Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents.

127.     These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to provide and then billed to GEICO and other insurers.

128.     Pursuant to the CPT Assistant, a "detailed" patient history requires – among other things – that the examining physician take a history of systems related to the patient's presenting problems, as well as a review of a limited number of additional systems.

129.     Pursuant to the Fee Schedule, a "detailed" patient history also requires that the healthcare provider take a past medical history, family, and social history from the patient to the extent that the patient's past medical history, family, and social history is related to the patient's presenting problems.

130.     However, no Initial Examination Defendant ever took a "detailed" patient history from Insureds during the initial examinations, inasmuch as they did not review systems related to the patients' presenting problems, did not conduct any review of a limited number of additional systems, and did not take a past medical history, family, and social history from the patients to the extent that the patients' past medical history, family, and social history were related to the patients' presenting problems.

131.     Rather, after purporting to provide the initial examinations, the Initial Examination Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents, pursuant to the illegal "pay-to-play" arrangements that caused the owners/operators of the No-Fault Clinics to provide the Initial Examination Defendants with access to Insureds.

132.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that the Initial Examination Defendants purported to provide and then billed to GEICO and other insurers.

        (ii)     Misrepresentations Regarding "Comprehensive" and "Detailed" Physical Examinations

133.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

134.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to at least eight organ systems.

135.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

136.    When the Initial Examination Defendants billed for the initial examinations under CPT code 99204, they falsely represented that they performed a "comprehensive" patient examination on the Insureds they purported to treat during the initial examinations.

137.    In fact, no Initial Examination Defendant ever conducted a general examination of multiple patient organ systems or conducted a complete examination of a single patient organ system, nor did they document findings with respect to at least eight organ systems.

138.    Furthermore, although the Initial Examination Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during their putative initial examinations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

139.    Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the healthcare services provider conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

140.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    brief assessment of mental status;

(vi)    examination of gait and station;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)    coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)    examination of sensation.

141.    When the Initial Examination Defendants billed for the initial examinations under CPT code 99203, they falsely represented that they performed a "detailed" patient examination on the Insureds they purported to treat during the initial examinations.

142.    In fact, the Initial Examination Defendants never conducted a detailed patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

143.    In keeping with the fact the Initial Examination Defendants did not conduct legitimate initial examinations, but rather performed perfunctory examinations pursuant to the improper financial arrangements and need to justify other Fraudulent Services and medical services at the No-Fault Clinics, the Initial Examination Defendants' motor examinations were not specific and clinically useless and they did not routinely perform any sensory examinations regardless of patient's complaints or symptoms.

144.    Additionally, the Initial Examination Defendants often documented incorrect findings (i.e. a failing test when the report states normal findings) and included contradictory findings based on the examination notes.

(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making

145.    In addition, when the Initial Examination Defendants submitted charges for initial examinations under CPT code 99204, they represented that they engaged in medical decision-making of "moderate complexity."

146.    When the Initial Examination Defendants submitted charges for initial examinations under CPT code 99203, they represented that they engaged in medical decision-making of "low complexity."

147.    Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

148.    Though the Initial Examination Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" (when billed under CPT code 99204), or "low complexity" (when billed under CPT code 99203), in actuality the initial examinations did not involve any medical decision-making at all, and, in the unlikely event that an Insured did present with such injuries or symptoms, the deficient initial examinations were incapable of assessing and/or diagnosing them as such.

149.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Initial Examination Defendants for "treatment", they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Initial Examination Defendants did not request any medical records from any other providers, nor conducted any diagnostic tests.  As noted above, Landow did not consider the patients to be the Defendants' patients, but rather the patients of the respective Clinics as they did not arrive for treatment based on any marketing, advertising or outreached performed by Landow or any of the Defendants.

150.     Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

151.     Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Initial Examination Defendants if properly administered, to the extent that the Initial Examination Defendants provided any such diagnostic procedures or treatment options in the first instance. In the unlikely event that such risks did exist, the deficient initial examinations were incapable of identifying such risks.

152.     Third, the Initial Examination Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

153.     Rather, to the extent that the initial examinations were conducted in the first instance, the Initial Examination Defendants provided a nearly identical, pre-determined "diagnosis" for the Insureds, and prescribed a similar course of treatment for each Insured.

154.     The purported results of the initial examinations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Initial Examination Defendants purported to perform as well as the other services provided at the Clinics and then billed to GEICO.

155.     For example, the initial examination findings often did not support the supposed subjective complaints and rarely, if ever was there any explanation as to why Insured's treatment plans were virtually identical, consisting of a routine set of services that were referred, recommended and prescribed despite lack of clinical documentation in the initial examination reports.  Typically, such a plan included (i) MRIs; (ii) trigger point and other injections; (iii) pharmaceuticals; and (iv) extensive physical therapy and chiropractic treatments are all necessary,

but they are ordered anyway despite a complete lack of clinical justification. Additionally, there was rarely, if ever, evidence of documentation showing any coordination of care with chiropractic or physical therapy providers at the Clinics.

156.    As part of the treatment plan the Initial Examination Defendants document, they also prescribe various medically unnecessary pharmaceuticals and DME despite there being no legitimate symptoms for such prescriptions. These Initial Examination Defendants wrote these prescriptions pursuant to the improper financial arrangements with the clinic owners/controllers and others at the various Clinics to justify the continued treatment of the patients and for financial gain.

157.    In keeping with the fact that these prescriptions were not medically necessary, the Initial Examination Defendants routinely prescribed certain pharmaceuticals, based on the improper kickback and financial arrangements, that were not FDA approved, despite Landow testifying at an EUO that he prefers FDA approved pharmaceuticals. In fact, Landow did not know if all of the pharmaceuticals prescribed by his professional corporations were FDA approved, nor was there financial incentive to use only FDA approved pharmaceuticals.

158.    Additionally, as noted above, the Initial Examination Defendants rendered services from certain clinics such as 3910 Church Avenue, Brooklyn and 492 Lefferts Avenue, Brooklyn where GEICO obtained information that the clinic controls and laypersons were doctoring and forging prescriptions for DME and other items.

159.    In fact, it's clear that the Initial Examination Defendants prescribed DME, pharmaceuticals, and other items, such as MRIs to falsely document that Insureds appear severely injured and to legitimize the other Fraudulent Services the Defendants performed and the other medical services Insureds received at the No-Fault Clinics.

160.     In addition, as evidence the PC Defendants were nothing more than interchangeable billing entities not providing legitimate medical services and the initial examinations were nothing more than profit generating services and not to benefit patients, multiple Initial Examination Defendants performed "initial examinations" on the same Insured.  The initial examinations were billed under CPT codes 99203 and/or 99204 in violation of the Fee Schedule, applicable guidelines, and the standard of care.

161.     For example,

(i)     On June 8, 2016, an Insured named FM was allegedly involved in a motor vehicle accident.  On December 7, 2016, FM received an initial evaluation from Preferred, which was billed under CPT code 99204.  On January 4, 2017, FM received another initial examination from Preferred, which was also billed under CPT code 99204.  Finally, on March 7, 2017, FM received another initial examination from Paramount, which was billed under CPT code 99203.

(ii)    On August 13, 2016, an Insured named GV was allegedly involved in a motor vehicle accident.  On November 22, 2016, GV received an initial evaluation from Preferred, which was billed under CPT code 99203.  On January 11, 2017, GV received another initial evaluation from Preferred, which was billed under CPT code 99204.  Finally, on February 7, 2017, GV received another initial evaluation from Paramount, which was billed under CPT code 99203.

(iii)   On October 31, 2016, an Insured named JS was allegedly involved in a motor vehicle accident.  On November 3, 2016, JS received an initial evaluation from Preferred, which was billed under CPT code 99203.  On January 3, 2017, JS received an initial examination from Paramount, which was billed under CPT code 99204.  Finally, on March 29, 2018, JS received another initial evaluation from Paramount, which was billed under CPT code 99203.

(iv)    On November 16, 2016, an Insured named CA was allegedly involved in a motor vehicle accident.  On November 22, 2016, CA received an initial examination from Preferred, which was billed under CPT code 99203.  On January 18, 2017, CA received another initial examination from Preferred, which was billed under CPT code 99204.  Finally, on March 21, 2017, CA received another initial evaluation from Paramount, which was billed under CPT code 99203.

(v)     On December 10, 2016, an Insured named ADGV was allegedly involved in a motor vehicle accident. On January 4, 2017, ADGV received an initial examination from Preferred, which was billed under CPT code 99203. On January 31, 2017, ADGV received an initial examination from Paramount, which was billed under CPT code 99203.

(vi)    On March 31, 2017, an Insured named MS was allegedly involved in a motor vehicle accident. On April 11, 2017, MS received an initial evaluation from Paramount, which was billed under CPT code 99203. On May 17, 2017, MS received an initial evaluation from Preferred, which was billed under CPT code 99203. Finally, on April 8, 2018, MS received another initial evaluation from Paramount, which was billed under CPT code 99204.

(vii)   On May 6, 2018, an Insured named MA was allegedly involved in a motor vehicle accident. On May 15, 2018, MA received an initial examination from Paramount, which was billed under CPT code 99203. On September 23, 2018, MA received an initial examination from Preferred, which was billed under CPT code 99203. Finally, on February 17, 2019, MA received another initial examination from Spruce, which was also billed under CPT code 99203.

(viii)  On November 7, 2018, an Insured named DBA was allegedly involved in a motor vehicle accident. On November 15, 2018, DBA received an initial evaluation from Paramount, which was billed under CPT code 99203. On December 19, 2018, DBA received an initial evaluation from Preferred, which was billed under CPT code 99203. Finally, on December 30, 2018, DBA received another initial evaluation from Preferred, which was also billed under CPT code 99203.

(ix)    On May 30, 2019, an Insured named RC was allegedly involved in a motor vehicle accident. On June 6, 2019, RC received an initial examination from Birch, which was billed under CPT code 99203. On June 20, 2019, RC received an initial examination from Spruce, which was billed under CPT code 99203. Finally, on July 8, 2019, RC received another initial examination from Summit, which was also billed under CPT code 99203.

(x)     On October 27, 2019, an Insured named EAAG was allegedly involved in a motor vehicle accident. On December 12, 2019, EAAG received an initial examination from Eastern, which was billed under CPT code 99204. On February 19, 2020, EAAG then received another initial evaluation from Macintosh, which was also billed under CPT code 99204.

## 2.     The Fraudulent Follow-Up Examinations

162.     In addition to the fraudulent initial examinations, Defendants Paramount, Preferred, Birch, Eastern and Macintosh ("Follow-Up Examination Defendants") typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

163.     The Follow-Up Examination Defendants typically billed the follow-up examinations to GEICO under CPT code 99213, resulting in a charge of $64.07 or CPT code 99214, resulting in a charge of $92.98 (or $92.97).

164.     Like the Defendants' charges for the initial examinations, the charges for the follow-up examinations were fraudulent in that the follow-up examinations were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the illegal kickback and financial arraignments, referral schemes and fraudulent treatment protocol.

165.     The charges for the follow-up examinations also were fraudulent in that they misrepresented the extent of the follow-up examinations.

166.     The use of CPT code 99213 typically requires that the physician spend 15 minutes of face-to-face time with the Insured or the Insured's family. Likewise, the use of CPT code 99214 typically requires that the physician spend 25 minutes of face-to-face time with the Insured or the Insured's family.

167.     Though the Defendants routinely billed for the follow-up examinations under CPT codes 99213 or 99214, no physician associated with the Follow-Up Examination Defendants ever spent 15 minutes of face-to-face time with the Insureds or their families during the follow-up examinations, much less 25 minutes. Rather, the follow-up examinations rarely lasted no more than 10 minutes, to the extent that they were conducted at all.

168.     In most cases, the Follow-Up Examination Defendants did not actually provide any legitimate follow-up examination but instead issued bogus, boilerplate "follow-up examination" reports to further support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to GEICO and other insurers, including interventional pain management injections and surgical procedures.  The bogus, boilerplate results were also used to support the other medical services being performed at the Clinics where the Follow-Up Examination Defendants operated.

**3.     The Fraudulent "Outcome Assessment Testing"**

169.     In addition to the other Fraudulent Services, Defendants Paramount, Preferred, Birch, Eastern and Macintosh ("Outcome Assessment Testing Defendants"), pursuant to their fraudulent billing and treatment protocol and illegal kickback and financial arrangements and referral scheme, caused bills to be submitted to GEICO representing that the Outcome Assessment Testing Defendants frequently subjected Insureds to medically useless "outcome assessment tests" on or about the same dates they purported to subject the Insureds to initial or follow-up examinations.

170.     The Outcome Assessment Testing Defendants billed the "outcome assessment tests" to GEICO using CPT code 99358, generally resulting in a charge of $204.41 for each round of "testing."

171.     Like Defendants' charges for the other Fraudulent Services, the charges for the "outcome assessment tests" were fraudulent in that the tests were medically unnecessary and were performed, to the extent they were performed at all, pursuant to the illegal kickback and referral schemes and fraudulent treatment protocol.

172.     The "outcome assessment tests" that the Outcome Assessment Testing Defendants purportedly provided to Insureds – to the extent provided at all – were simply pre-printed, multiple-choice questionnaires on which the Insureds were invited to report the symptoms they purportedly were experiencing, and the impact of those symptoms on their daily lives.

173.     Since a patient history and physical examination must be conducted as an element of a soft-tissue trauma patient's initial and follow-up examinations, and since the "outcome assessment tests" that the Outcome Assessment Testing Defendants purportedly provided were nothing more than a questionnaire regarding the Insureds' history and physical condition, the Fee Schedule provides that the "outcome assessment tests" should have been reimbursed as an element of the initial and follow-up examinations.

174.     In other words, healthcare providers cannot conduct and bill for an initial examination or follow-up examination and then bill separately for contemporaneously-provided "outcome assessment testing."

175.     In the event the Outcome Assessment Testing Defendants did perform the "outcome assessment tests" for which GEICO was billed, the information gained through the use of the tests would not have been significantly different from the information that the Outcome Assessment Testing Defendants purported to obtain during virtually every Insured's initial and follow-up patient history and examinations. In fact, the Defendants, in billing for fraudulent initial and follow-up examinations, represented they took at least a "detailed" if not "comprehensive" patient history and performed at least a "detailed" if not "comprehensive" physical examination.

176.     The "outcome assessment tests" represented purposeful and unnecessary duplication of the patient histories and examinations purportedly conducted during the Insureds' initial examinations and follow-up examinations. The "outcome assessment tests" were part and

parcel of the Outcome Assessment Testing Defendants' fraudulent scheme, inasmuch as the "service" was rendered – to the extent rendered at all – pursuant to a predetermined protocol that was designed solely to financially enrich the Defendants and in no way aided in the assessment and treatment of the Insureds.

177.    The Outcome Assessment Testing Defendants' use of CPT code 99358 to bill for the "outcome assessment tests" also constituted a deliberate misrepresentation of the extent of the service that was provided. Pursuant to the Fee Schedule, the use of CPT code 99358 represents – among other things – that the physician actually spent at least one hour performing some prolonged service, such as a review of extensive records and tests, or communication with the Insured and the Insured's family.

178.    Though the Outcome Assessment Testing Defendants routinely submitted billing under CPT code 99358 for "outcome assessment tests", no physician associated with the Outcome Assessment Testing Defendants spent an hour reviewing or administering the tests, or communicating with the Insureds or their families.

179.    Indeed, the "outcome assessment tests" did not require any physician involvement at all, inasmuch as the "tests" simply were questionnaires that were completed by the Insureds.

180.    Nevertheless, the Outcome Assessment Testing Defendants submitted billing to GEICO for billing under CPT code 99358.

181.    In keeping with the fact that the Outcome Assessment Testing Defendants had no medical justification for performing the outcome assessment testing, Paramount, Birch, Eastern and Medical billed for outcome assessment testing on approximately 99% of GEICO insureds.

182.    Additionally, of the Insureds who received an outcome assessment test, 99% of Insureds received the outcome assessment testing on the same day as an examination, rendering

the testing completely medically unnecessary and repetitive of the purported examination concurrently performed.

183.    As the outcome assessment tests were medically unnecessary and were performed pursuant to the Outcome Assessment Testing Defendants' pre-determined fraudulent treatment protocol and illegal kickback scheme, the results of the outcome assessment tests like the other Fraudulent Services, were not incorporated into the Insureds' respective treatment plans.

**4.    The Fraudulent Charges for Electrodiagnostic Testing**

184.    Defendants Preferred, Spruce and Summit ("EDX Defendants") also purported to subject many Insureds to a series of medically unnecessary and useless nerve conduction velocity ("NCV") and electromyography ("EMG") tests (collectively "EDX tests").

185.    The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed pursuant to the illegal kickback and financial arrangements and referral schemes, not to treat or otherwise benefit the Insureds.

186.    Indeed, Landow's inability to supervise and interpret the EDX tests is evident as he hired numerous physicians who purported to render the Fraudulent Services to Insureds on behalf of the EDX Defendants who are no strangers to this very type of scheme and many of which who are not qualified to perform the EMG testing in the first instance.  For example, Joseph Raia, M.D., Lily Zarhin, M.D. Madhu Boppana, M.D., Neil Morgenstern, M.D., and Yekaterina Slukhinsky, M.D. have been involved in the performance of medically unnecessary EDX testing, misrepresenting and exaggerating the level of services provided in order to inflate the charges for the EDX testing, and performing the EDX testing as independent contractors of various medical professional corporations.  See <u>Government Employees Insurance Co., et al v. Starrett City Medical, P.C., et al</u>, 21-cv-59; <u>Government Employees Insurance Co., et al v. Badia, M.D., et al</u>,

13-cv-01720 (CBA)(VMS); Government Employees Insurance Co., et al v. LLJ Therapeutic Services, P.T., et al, 15-cv-4818 (KAM)(RLM); Government Employees Insurance Co., et al v. Prescott, et al, 14-cv-00057 (BMC); Government Employees Insurance Co., et al v. Slukhinsky, et al, 19-cv-03080 (CBA)(RML); Government Employees Insurance Co., et al v. Fritz Gondre, et al, 607957/2016 (Sup. Ct., Nassau Cty).

187.    Additionally, Landow purportedly hired Paul Hannan, M.D. who ended up surrendering his New York state medical license in 2020 based on not disclosing information related to discipline on his Florida medical license.

188.    In keeping with the fact that the EDX testing was medically unnecessary and performed pursuant to the illegal kickback, financial and referral arrangements, the EDX Defendants routinely performed the EDX testing on the same day as an examination, suggesting that it was pre-ordained that the examination would results in "findings" that lead to the EDX testing by the EDX Defendants.

189.    For example,

(i)    On May 14, 2018, an Insured named ES was allegedly involved in a motor vehicle accident.  On June 20, 2018, ES received an initial office consultation with Preferred.  On that same day, ES received EMG/NCV testing from Preferred.  Then on July 25, 2018, ES again received an initial office consultation with Preferred.  On that same day, ES again received EMG/NCV testing from Preferred.

(ii)    On June 23, 2018, an Insured named GR was allegedly involved in a motor vehicle accident.  On August 16, 2018, GR received an initial office consultation with Preferred.  On that same day, GR received EMG/NCV testing from Preferred.

(iii)    On September 10, 2018, an Insured named SC was allegedly involved in a motor vehicle accident.  On August 16, 2018, SC received an initial office consultation with Preferred.  On that same day, SC received EMG/NCV testing from Preferred.

(iv)    On September 27, 2018, an Insured named KV was allegedly involved in a motor vehicle accident.  On November 19, 2018, KC received an initial office consultation with Preferred.  On that same day, KC received EMG/NCV testing from Preferred.

(v)     On December 20, 2018, an Insured named KR was allegedly involved in a motor vehicle accident.  On June 25, 2019, KR received an initial evaluation with Summit.  On that same day, KR received EMG/NCV testing from Summit.

(vi)    On January 4, 2019, an Insured named IS was allegedly involved in a motor vehicle accident.  On February 14, 2019, IS received an initial evaluation with Spruce.  On that same day, IS received EMG/NCV testing from Spruce.

(vii)   On March 2, 2019, an Insured named AD was allegedly involved in a motor vehicle accident.  On April 5, 2019, AD received an initial evaluation with Spruce.  On that same day, AD received EMG/NCV testing from Spruce.

(viii)  On April 3, 2019, an Insured named JB was allegedly involved in a motor vehicle accident.  On June 14, 2019, JB received an initial evaluation with Summit.  On that same day, JB received EMG/NCV testing from Summit.

(ix)    On May 14, 2019, an Insured named OB was allegedly involved in a motor vehicle accident.  On June 7, 2019, OB received an initial evaluation with Spruce.  On that same day, OB received EMG/NCV testing from Spruce.

(x)     On June 1, 2019, an Insured named KAR was allegedly involved in a motor vehicle accident.  On June 27, 2019, KAR received an initial evaluation with Summit.  On that same day, KAR received EMG/NCV testing from Summit.

(a) The Human Nervous System and Electrodiagnostic Testing

190.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

191.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves.  They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

192.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

193.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the EDX Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

194.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

195.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

(b)    The Fraudulent NCVs

196.     NCV tests are non-invasive tests in which peripheral nerves, including those in the arms and legs, are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing", of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

197.     An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

198.     In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

199.     There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers either or both of which can be tested with NCV tests.

200.     F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

201.     According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

202. In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, the EDX Defendants routinely purported to test far more nerves than recommended by the Recommended Policy, and then submitted billing to GEICO through the EDX Defendants.

203. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, on virtually every Insured, the EDX Defendants routinely purported to perform: (i) NCV tests of 8 motor nerves; (ii) NCV tests of 8-10 sensory nerves; and (iii) two H-reflex studies.

204. Therefore, where the Fee Schedule and Recommended Policy would limit billing by the EDX Defendants for NCV testing of one Insured to approximately $950.00, representing NCVs of three motor nerves, NCVs of two sensory nerves, and two H-reflex studies, the EDX Defendants routinely submitted NCV billing to GEICO for approximately $2,000.00 per Insured.

205. The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

206. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

207. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

208. This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

209. This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

210. Even so, Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

211. Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers. This is true regardless of the EDX Defendants billing for the NCV test and the purported medical professional overseeing and/or rendering the NCV services for the EDX Defendants.

212. Though the NCVs are allegedly rendered to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history and examination performed to create a foundation for the EDX testing. In actuality and as a result of the Fraudulent examinations, NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured and to support the other Fraudulent Services and medical services provided by medical providers at the No-Fault Clinics where the EDX Defendants operated.

213. The EDX Defendants' "cookie-cutter" approach did not reflect individual care towards any patient and often failed to discuss and report on technically deficient NCV studies, which would make it virtually impossible to assist in determining a radiculopathy diagnosis and that rendered the testing of such poor quality that they were medically unnecessary. The poor quality of these NCV tests suggests that, contrary to the AANEM's position on proper performance and interpretation of Electrodiagnostic Studies, the EDX Defendants were not reviewing the NCV test results in "real time," as they are performing the test and/or prior to finishing the NCV portion

of the testing. Without such contemporaneous review, there can be no determination as to the actual quality of test and the necessity of the testing is therefore suspect. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

(c)    The Fraudulent EMG Tests

214.    As part of their pre-determined fraudulent treatment and billing protocol, the EDX Defendants also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests.

215.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

216.    The EDX Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies. As noted above, the Defendants did not take a proper history or examination of Insureds that would indicate radiculopathy symptoms or signs or any other medical problems arising from any automobile accidents.

217.    In actuality, to the extent the EDX Defendants purported to provide EMG tests to Insureds at all, the tests were provided pursuant to the illegal kickback and referral schemes and fraudulent treatment protocol, not to treat or otherwise benefit the Insureds.

218.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon

a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

219.    Even so, the EDX Defendants did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each patient. Instead, based on the individual purportedly performing the EMG, the EDX Defendants routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

220.    Furthermore, even if there were any need for any of these EMG tests, the nature and number of the EMG tests that Defendants purported to provide and/or perform grossly exceed the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

221.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

222.    Nonetheless, Defendants purported to provide and/or perform EMG tests on four limbs on virtually every Insured, in contravention of the Recommended Policy, solely in order to maximize the fraudulent billing that they could submit to GEICO.

223.    Specifically, if all other conditions of coverage are satisfied, the Fee Schedule (prior to October 1, 2020) permitted lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum EMG charges, as relevant here, of: (i) $241.50 under CPT code 95861 if an EMG is performed on two limbs; and (ii) $408.64 under CPT code 95864 if an EMG is performed on four limbs. To be eligible for reimbursement under either of these CPT codes, the healthcare professional must test at least five muscles per limb when performing the EMG.

224.     Not only did the EDX Defendants routinely purport to provide four-limb EMGs to Insureds; in most cases, the EDX Defendants unbundled their four-limb EMG charges into two separate two-limb EMG charges of $241.50 per Insured, rather than a single four-limb EMG charge of $408.64, to maximize their EMG billing and conceal the fact that they were contravening the Recommended Policy by performing four-limb EMGs on many Insureds.

225.     As Landow was not qualified to supervise or oversee the EMG/NCV testing, the EDX Defendants' documentation often did not support the services being rendered and billed to GEICO.  For example, on numerous occasions: (i) the EDX Defendants' examination findings did not support the need for the EMG/NCV testing; (ii) Hannon routinely tested an insufficient number of muscles per limb on an EMG study; (iii) Kenworthy routinely tested approximately 40 muscles per EMG study, which is significantly outside the standard of care; (iv) Hannon routinely had clinical findings that did not correlate with the EMG/NCV test results (i.e. findings of weakness that suggested a patient was disabled); and (v) the EDX Defendants sometimes had radiculopathy diagnosis based on an insufficient set of abnormalities.

226.     In keeping with the fact that the purported EMG tests were medically useless, the "results" of the EDX Defendants' EMG tests were not incorporated into any Insured's treatment plan and they played no genuine role in the treatment or care of the Insureds.

           (d)     The Fraudulent "Radiculopathy" Diagnoses

227.     Radiculopathies – disorders of spinal nerve roots – are relatively low frequency in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

228.     Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the EDX Defendants purportedly treated.

229.     As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

230.     Virtually none of the Insureds whom the EDX Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy. In fact, in the unlikely event that an Insured did present with such problems or symptoms, the deficient initial consultations were incapable of assessing and/or diagnosing them.

231.     Even so, the EDX Defendants falsely purported to diagnose radiculopathies in most Insureds that purportedly received EMG/NCV tests from the Defendants.

232.     Where radiculopathy was diagnosed, the EDX Defendants purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services and the continued treatment of Insureds where the EDX Defendants operated.

**5.   The Fraudulent Charges for LINT/TPII Treatment**

233.     Landow, through Sovereign ("LINT/TPII Defendants") purported to provide Insureds with Localized Intense Neurostimulation Therapy and Trigger Point Impedance Imaging ("LINT/TPII Treatment") using equipment called a Nervomatrix Device.

234. The LINT/TPII Defendants purported to perform virtually all of the LINT/TPII Treatments, which then were billed to GEICO under CPT code 99199, typically resulting in a charge of $2,455.00 per session.

235. Like the charges for the other Fraudulent Services, the charges for the LINT/TPII Services, which were performed by technicians, were fraudulent in that they misrepresented the LINT/TPII Defendants eligibility to collect No-Fault Benefits in the first instance.

236. In fact, the LINT/TPII Defendants never were eligible to collect No-Fault Benefits in connection with the claims identified in Exhibit "3", because – as a result of the fraudulent scheme described herein – they were not in compliance with all relevant laws and regulations governing healthcare practices in New York.

237. Additionally, the charges for the LINT/TPII Treatments were fraudulent in that the LINT/TPII Treatments were medically useless and were provided, to the extent that they were provided at all, solely in order to maximize the billing submitted through the LINT/TPII Defendants and to justify the Fraudulent Services and other medical services at the No-Fault Clinics where the LINT/TPII Defendants operated, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(i) Standard of Care for the Diagnosis and Treatment of Trigger Points

238. Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

239.     In a legitimate clinical setting, trigger points are diagnosed as part of a standard physical examination based upon pain that results when pressure is applied to a specific area of a patient's body.

240.     In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

241.     Should an initial course of conservative therapies fail to remediate trigger points, trigger point injections may be warranted. Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

(ii)     The Medically Useless LINT/TPII Treatment

242.     LINT/TPII Treatment is a two-step process that purports to use the Nervomatrix Device to both diagnose and treat trigger points. First, the Nervomatrix Device allegedly identifies the most clinically relevant active trigger points along a person's skin by measuring electrical resistance on the skin surface, which generates a two-dimensional image of skin impedance. Then a moving row of twenty-six miniature probes that touch, but do not penetrate the skin surface, provide electrical pulses to the targeted trigger points. These electrical pulses purportedly stimulate the release of endorphins to alleviate a patient's pain. Typically, LINT/TPII Treatment is administered once per week over the course of six weeks for 30 minutes sessions.

243.     In actuality, however, LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points.

244.     In keeping with the fact that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, the Nervomatrix Device has never been approved by the Food and Drug Administration ("FDA") to be used in the diagnosis and treatment of trigger points.

245.     There are no reliable, peer-reviewed data that establish the effectiveness of the Nervomatrix Device and LINT/TPII Treatment. Indeed, studies have found that the Nervomatrix Device does not actually improve a patient's back pain and does not result in a better outcome than a placebo treatment. Notably, the only published data that actually contends that the Nervomatrix Device is effective in diagnosing and treating trigger points was published in 2011 by Dr. Miguel Gorenberg, the founder of a Delaware company that developed and manufactured the Nervomatrix Device – Nervomatrix.

246.     In further keeping with the fact that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points, Nervomatrix ceased operations in 2018 and was dissolved on February 17, 2019. In addition, the company's website, soleve.com, is no longer operational. Although the Nervomatrix Device had been available in the United States since at least 2014, presently, only a few known providers have submitted bills to GEICO for LINT/TPII Treatments using the Nervomatrix Device.

247.     Indeed, LINT/TPII Treatment and the Nervomatrix Device are so outside the standard of care for the diagnosis and treatment of trigger points that Landow, a practicing physician for over 20 years, had never heard of LINT/TPII Treatment or the Nervomatrix Device until he was introduced to the machine and treatment by an attorney in 2018, around the time the manufacturer of the Nervomatrix Device was ceasing all operations.

248. Landow then began "leasing" multiple Nervomatrix Devices for approximately $10,000.00 to 15,000.00 per month. Upon information and belief, these devices were acquired by the leasing company for approximately $5,000.00.

249. Even if the LINT/TPII treatment had any medical utility, which it does not, actual focal trigger points should be noted on examination prior to the performance of such treatment. Routinely, Sovereign, the PC Defendant (or other medical provider) that referred the Insured to Sovereign for LINT/TPII testing should have identified the trigger points on examination, which was not done.

250. Further, the LINT/TPII Defendants' medical records were misleading as they submitted a letter of medical necessity form to GEICO which purported to suggest that New York State established some standard of treatment when in fact it had not.

251. In keeping with the fact, the LINT/TPII treatment was medically unnecessary and performed pursuant to the illegal kickback, financial and referral arrangements, Sovereign purported to perform LINT/TPII testing on Insureds who also received trigger point injections under guidance.

252. For example, and these are only representative samples,

(i) Insured AS was allegedly involved in a motor vehicle accident on January 3, 2018. On February 22, 2018, April 12, 2018, May 17, 2018, June 19, 2018, and August 2, 2018, AS received trigger point injections administered by Paramount. On September 4, 2018 and September 25, 2018, AS received LINT/TPII Treatment, billed to GEICO under CPT code 99199, from Sovereign. AS received additional trigger point injections administered by Paramount on September 6, 2018, September 20, 2018, October 4, 2018, November 1, 2018, and November 29, 2018. Finally, AS received additional trigger point injections administered by Eastern on October 24, 2019, November 21, 2019, and December 26, 2019, and additional trigger point injections administered by Macintosh on February 27, 2020.

(ii) Insured GO was allegedly involved in a motor vehicle accident on May 17, 2018. GO received LINT/TPII Treatment, billed to GEICO under CPT code

99199, from Sovereign on July 10, 2018, July 17, 2018, July 25, 2018, July 31, 2018, and August 7, 2018. On August 8, 2018, GO received a trigger point injection administered by Paramount. On August 15, 2018, GO received LINT/TPII Treatment, billed to GEICO under CPT code 99199, from Sovereign. Finally, on November 28, 2018, GO received additional trigger point injections administered by Paramount.

(iii)    Insured LVQ was allegedly involved in a motor vehicle accident on June 18, 2018. On June 26, 2018 and July 24, 2018, LVQ received trigger point injections administered by Paramount. On September 19, 2018, September 21, 2018, September 24, 2018, September 26, 2018, October 1, 2018, and October 9, 2018, LVQ received LINT/TPII Treatment, billed to GEICO under CPT code 99199, from Sovereign. LVQ received additional trigger point injections administered by Paramount on October 30, 2018 and November 27, 2018. LVQ then received additional LINT/TPII Treatment, billed to GEICO under CPT code 99199, from Sovereign on December 10, 2018, December 13, 2018, and December 18, 2018. Finally, LVQ received a trigger point injection administered by Paramount on December 18, 2018, and one administered by Birch on March 12, 2019.

(iv)    Insured RR was allegedly involved in a motor vehicle accident on July 12, 2018. On July 26, 2018, RR received trigger point injections administered by Paramount. On August 14, 2018, August 22, 2018, August 29, 2018, September 25, 2018, September 26, 2018, October 3, 2018, October 4, 2018, and October 5, 2018, RR received LINT/TPII Treatment, billed to GEICO under CPT code 99199, from Sovereign. On October 11, 2018 and December 13, 2018, RR received additional trigger point injections administered by Paramount. Finally, on March 7, 2019, RR received a trigger point injection administered by Birch.

(v)    Insured GYGF was allegedly involved in a motor vehicle accident on August 1, 2018. On August 9, 2018, GYGF received trigger point injections administered by Paramount. On September 11, 2018, GYGF received LINT/TPII Treatment, billed to GEICO under CPT code 99199, from Sovereign. GYGF received additional trigger point injections administered by Paramount on September 13, 2018, October 18, 2018, November 15, 2018, December 20, 2019, January 17, 2019, and January 24, 2019. GYGF also received LINT/TPII Treatment, billed to GEICO under CPT code 99199, from Sovereign on September 18, 2018, September 24, 2018, September 27, 2018, October 1, 2018, October 9, 2018, October 12, 2018, October 16, 2018, October 22, 2018, October 25, 2018, and October 31, 2018. Finally, GYGF received additional trigger point injections administered by Birch on April 25, 2019 and May 23, 2019, and additional trigger point injections administered by Eastern on July 25, 2019 and August 8, 2019.

253.    In further keeping with the fact that that LINT/TPII Treatment is medically useless for both the diagnosis and the treatment of trigger points: (i) the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of CPT codes for healthcare providers to use in describing their services for billing purposes, does not recognize a CPT code for LINT/TPII Treatment; and (ii) the putative "results" of the LINT/TPII Treatments purportedly performed by the LINT/TPII Defendants: (a) were not incorporated into any Insured's treatment plan; (b) played no legitimate role in the overall treatment or care of the Insureds; and (c) had minimal, if any, impact on the Insureds' range of motion deficits and level of back pain.

**6.    The Fraudulent Acupuncture Treatment**

254.    In addition to the other Fraudulent Services that Defendants purported to provide, Defendant Sovereign ("Acupuncture Defendant") also purported to subject many Insureds to a series of medically unnecessary acupuncture treatments.

255.    Despite not being licensed to practice acupuncture, Landow caused Sovereign to begin performing acupuncture services from two Clinics, 1120 Morris Park Avenue, Bronx ("Morris Park Avenue Clinic") and 1767 Southern Boulevard, Bronx ("Southern Boulevard Clinic").

256.    In fact, Landow testified that he purportedly amended the ownership of Sovereign to provide an acupuncturist, Hao Zhang, M.D., L.Ac. ("Zhang") with nominal ownership in Sovereign.  However, there is no public record of Zhang having any ownership interest in Sovereign and upon information and belief, Landow never transferred any actual ownership interest to Zhang.

257.    For example, based on testimony provided at the EUO of Sovereign, GEICO requested Landow provide corporate documents evidencing the transfer of partial ownership in Sovereign to Zhang.  However, Landow never produced such documentation, as upon information and belief, no such documents exist.

258.    Similarly, Landow is listed as the "owner" of Sovereign on the billing submitted to GEICO for acupuncture services and there is never reference to Zhang being an owner on any of the over 1,000 bills submitted to GEICO or any of the supporting records or documentation.

259.    Indeed, as with the EDX Defendants, Landow's inability to supervise and understand the acupuncture treatment is evident as he purported to hire numerous acupuncturists to render the Fraudulent Services to Insureds on behalf of Sovereign who are no strangers to this very type of scheme.  For example, You Jun Ren, L.Ac., Gao Dixu, L.Ac. and Sachie Kuroyama, L.Ac. have been involved in the performance of medically unnecessary acupuncture treatment, misrepresenting and exaggerating the level of services provided in order to inflate the charges for the acupuncture treatment, and performing acupuncture treatment as independent contractors of various medical professional corporations.  See Government Employees Insurance Co., et al., v. East Flatbush Medical, P.C., et al., 20-CV-1695 (MKB)(PK); Government Employees Insurance Co., et al v. Rolando Chumaceiro, M.D., et al, 20-cv-2220 (EK)(PK); Government Employees Insurance Co., et al v. Weili Li, L.Ac., et al, 13-cv-2327 (KAM)(RML).

260.    Regardless of not being entitled to reimbursement for acupuncture services billed through Sovereign, Landow caused GEICO Insureds to be subject to a series of medically unnecessary acupuncture treatments at the Morris Park Avenue Clinic and the Southern Blvd Clinic.

261. Like Defendants' charges for the other Fraudulent Services, the charges for acupuncture were fraudulent in that the acupuncture was medically unnecessary and was performed – to the extent it was performed at all – pursuant to illegal kickback and financial arrangements, not to treat or otherwise benefit the Insureds.

(i)     Legitimate Acupuncture Practices

262. Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi"). When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted, or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

263. The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity.

264. The first step in any legitimate acupuncture treatment is a physical examination of the patient. The two most critical components of this examination are the appearance of the patient's tongue (i.e., color, shape, texture, etc.) and various measurements of the patient's pulse (i.e., rate, rhythm, strength, etc.). The information gleaned from these elements of the physical examination is necessary to diagnose the patient's condition and thereby develop an acupuncture treatment plan designed to benefit the patient by restoring his unique Chi. In cases involving trauma, an actual physical examination also is appropriate to identify the location of the injury and consequent pain and – by extension – to identify the Meridians, if any, that have been disrupted.

265. The second step in any legitimate acupuncture treatment is the development of an acupuncture treatment plan. In developing a legitimate treatment plan, an acupuncturist will consider both the injuries sustained by the patient, as well as the tongue and pulse information obtained during the physical examination. Using this information, the acupuncturist will identify a unique, cohesive, and individualized set of Acupuncture Points into which needles can be inserted or pressure can be applied to restore the patient's Chi and address the patient's discrete injuries.

266. In developing a legitimate acupuncture treatment plan, an acupuncturist may choose from at least 360 discrete Acupuncture Points. Any legitimate acupuncture treatment plan should include the use of both "local" Acupuncture Points (i.e., points near the affected areas of the relevant Meridian), and "distal" Acupuncture Points (i.e., points that are distant from the affected areas of the relevant Meridian).

267. The third step in any legitimate acupuncture treatment is the implementation of the acupuncture treatment plan. If performed legitimately, this step typically will involve insertion of between 10 and 20 acupuncture needles into between 5 and 10 Acupuncture Points. Within these parameters, the number and location of the Acupuncture Points generally will vary based upon the unique circumstances presented by each patient as well as each patient's individual therapeutic response to each acupuncture treatment.

268. Any legitimate acupuncture treatment plan requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Acupuncture treatment plans are fluid and evolve over time. Therefore, the goal of any legitimate acupuncture treatment plan is to make appropriate adjustments as treatment progresses in order to

improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health by restoring his or her unique energy flow.

269. Any legitimate acupuncture treatment requires meaningful documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

(ii)    The Acupuncture Defendant's Fraudulent Treatment

270. Pursuant to the illegal kickback and financial arrangements at the Morris Park Avenue Clinic and the Southern Boulevard Clinic, the Acupuncture Defendant purported to begin treatment of Insureds with acupuncture treatment despite never performing an initial acupuncture examination.

271. This is not surprising as Landow is not an acupuncturist, could never practice acupuncture through Sovereign and could not supervise or understand the acupuncture services being billed through Sovereign.

272. As no acupuncturist associated with the Acupuncture Defendant performed an initial acupuncture examination, the subsequent services could not remotely comport with any of the basic, legitimate acupuncture requirements. For example, as there was no examination, no acupuncturist ever examined or noted as Insureds (i) palpation findings; (ii) visual examination such as gait changes, antalgic lean, and/or postural distortions; (iii) assessment of range of motion or impairment of activities of daily living detailed; (iv) specific location of the injuries; and (v) specific channels or Acupuncture Points.

273. The Acupuncture Defendant purported to provide acupuncture treatments that were billed to GEICO under CPT codes 97810 and 97811, typically resulting in charges of $30.00 and

$25.69, respectively, for each treatment segment. Harmonized Acupuncture also billed GEICO under CPT Code 97813, typically resulting in a charge of $79.89 for each treatment segment.

274.    Notwithstanding the fact that there were no acupuncture examinations preformed on Insureds, the purported "acupuncture" services provided by the Acupuncture Defendant did not remotely comport with any of the aforesaid basic, legitimate acupuncture requirements.  Instead, at best, they consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition and was not designed to effectively treat or otherwise benefit the Insureds. As such, these acupuncture treatments were not medically necessary. Indeed, they were designed solely to enrich the Acupuncture Defendant through the submission of fraudulent charges to GEICO and other insurers.

275.    For instance:

(i)    needles were inserted into a small range of common and repetitive Acupuncture Points that were clinically useless, often bore no relation to the diagnosed condition, and appeared to have been pre-determined solely for the sake of expediency;

(ii)    there was a very high frequency of treatment sessions that were not supported by the alleged injuries and were not adjusted to reflect the Insureds' improvement or lack thereof;

(iii)    in many cases, there was billing for the treatment of injuries when those injuries never actually were treated. For example, the same treatment points were repeated without change or adjustment and patients with different injuries purportedly received the same treatments; and

(iv)    generally, the treatments rendered were inadequate and were not intended to actually address the Insureds' injuries.

276.    The services billed by the Acupuncture Defendant also reflected a lack of independent professional acupuncture judgment and instead reflected a predetermined protocol based on the illegal kickback and financial arrangements which were designed to enrich Defendants (and others) through the submission of charges to GEICO.

277.     Furthermore, the documentation of the purported acupuncture treatments rendered by the Acupuncture Defendant demonstrates that no genuine effort was made to treat the patients' actual injuries, to properly assess their condition, to track their improvement or lack of improvement, or to adjust the treatment to reflect the patients' improvement or lack of improvement. The documentation of the treatment further demonstrates that, to a significant extent, it is used as nothing more than a sham to support a predetermined and fraudulent treatment protocol.

278.     By way of example, the Acupuncture Defendant's documentation suggests that Insureds never improved during the course of treatment, as pain scale numbers were identical over time, the same acupuncture points were used for the same duration of time and in fact, in the area where the acupuncturist and patient signatures should be placed, there is rarely, if ever, actual signatures identifiable on the SOAP notes.

279.     The Acupuncture Defendant's cookie-cutter treatment protocol is further established by its routine billing for the same number of units of acupuncture per treatment date per patient, purportedly consisting of up to 30 minutes of personal, one-on-one contact under CPT code 97810 and CPT Code 97811, with an added charge for Cupping under CPT code 97799.

280.     The Acupuncture Defendant'' fraudulent billing scheme misrepresented and exaggerated the level of services provided in order to inflate the charges submitted to GEICO. Specifically, the Acupuncture Defendant uniformly submitted billing to GEICO for multiple segments of purported one-on-one contact rendered on the same day for each Insured, notwithstanding the fact that the "treatments" allegedly rendered by the Acupuncture Defendant were (or could have been) rendered in one treatment segment.

281.    Likewise, the purported acupuncture treatment described in the Acupuncture Defendant's treatment notes in almost all cases fails to justify the billing submitted for multiple units of personal, one-on-one contact, along with re-insertion, for multiple units of treatment.

282.    The Acupuncture Defendant further fraudulently inflated its billing by charging for an "adjunct" acupuncture procedure, known as cupping. Cupping is at best an intermittent treatment, since the act of cupping dredges up stagnant blood and leaves bruises in the application area. Once stagnant blood has been moved, additional cupping is unnecessary – yet the Acupuncture Defendant billed for cupping during virtually every treatment session, without any evidence of effectiveness.

283.    The Acupuncture Defendant's cookie-cutter approach to the acupuncture "treatments" that they performed, or caused to be performed, on Insureds clearly was not based on medical necessity. Instead, the Acupuncture Defendants' cookie-cutter approach to the acupuncture "treatments" was designed solely to maximize the charges that Defendants could submit to GEICO and other insurers and justify the other Fraudulent Services and medical services performed at the No-Fault Clinics where the Acupuncture Defendant operated.

**7.  The Fraudulent Charges for Physical Therapy Treatment**

284.    As part of Defendants fraudulent scheme, Defendants Preferred, Spruce and Sovereign ("Physical Therapy Defendants") purported to subject many Insureds to a series of physical therapy treatments.

285.    Like Defendants' charges for the other Fraudulent Services, the charges for physical therapy treatment were fraudulent in that the physical therapy treatment was performed – to the extent that it was performed at all – pursuant to illegal kickback and financial arrangements and the fraudulent treatment protocol established by the Defendants.

286.     The charges for the physical therapy treatment that allegedly was provided by the Physical Therapy Defendants and billed to GEICO through also misrepresented the PT Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance as they were a product of the illegal kickback and financial arrangements among the Defendants and others. Additionally, the physical therapy treatment was performed in order to justify the other Fraudulent Services as well as the medical services being provided at the No-Fault Clinics where the Physical Therapy Defendants operated.

287.     In most cases, the Physical Therapy Defendants purported to subject each Insured to dozens of physical therapy treatments over an extended period of time, generally resulting in thousands of dollars of charges for each Insured.

288.     In most cases, the Insureds did not go to the hospital at all following their putative accidents and, to the extent that they did visit a hospital or other legitimate healthcare provider after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after an hour or two.

289.     Nonetheless, pursuant to Defendants' fraudulent treatment and billing protocol, following their initial examination/consultations and follow-up examinations, virtually every Insured was prescribed a medically unnecessary, extended course of physical therapy.

290.     The Physical Therapy Defendants' charges for the physical therapy were predicated on the boilerplate "diagnoses" they provided to the Insureds following the initial and follow-up examinations, as well as the medically useless diagnostic tests.

291.     But for these contrived "diagnoses" and diagnostic tests, the Physical Therapy Defendants would not have been able to submit charges for the physical therapy because they would have no way to justify the performance of the physical therapy.

292.    The Physical Therapy Defendants purported to provide Insureds with an initial physical therapy evaluation billed under CPT code 97001 resulting in a charge of $72.92 per evaluation. Notably, the Physical Therapy Defendants purported to provide a physical therapy evaluation despite the fact that it in many instances the Defendants had already subjected Insureds to an initial medical examination.

293.    The Physical Therapy Defendants routinely submitted the same combination of charges for physical therapy treatment provided to Insureds, namely: (i) hot packs, using CPT code 97010; (ii) electrical stimulation, using CPT code 97014; and (iii) therapeutic massage, using CPT code 97124.

294.    As a matter of course and based on the fact the physical therapy services, like the other services of Defendants (and medical providers at the Clinics), the physical therapy services were not coordinated with any of the medical providers at the Clinics, which is an essential component of any legitimate physical therapy regimen.  For example, the physical therapy, chiropractic care, and acupuncture services performed on Insureds were performed without communicating among medical providers regarding whether the treatments were consistent with one another.  Instead, most Insureds received concurrent physical therapy, chiropractic, and acupuncture services lasting three or more months, on many occasions occurring the same day and at the same time.

295.    The Physical Therapy Defendants subjected most Insureds to an extended course of passive physical therapy modalities such as hot/cold packs, electric stimulation and therapeutic massage, the performance such passive modalities not comport with legitimate physical therapy protocols but instead served to financially enrich the Defendants because: (i) the physical therapy services were systematically delivered over a period of months without regard to whether the

Insureds showed any actual improvement; (ii) the time expended in rendering the physical therapy was brief and did not typically change over the course of the treatment; (iii) the use of passive modalities far outweighed any active modalities provided to Insureds despite the fact that such active modalities would be necessary for legitimately treating patients with soft-tissue injuries; and (iv) they did not evaluate or incorporate the findings from the other Fraudulent Services into the Insureds' treatment.

296.    The Physical Therapy Defendants purported to provide this identical physical therapy treatment plan to virtually every Insured, in order to submit as much billing as possible for physical therapy services, without regard for genuine patient care.

**8.  The Fraudulent Charges for Medically Unnecessary Trigger Point Injections and Pain Management Injections**

297.    Based upon the phony, boilerplate "diagnoses" and "treatment plans" the Defendants documented, during their fraudulent initial examinations and follow-up examinations, Defendants Paramount, Preferred, Birch, Eastern and Macintosh ("Pain Management Defendants") purported to subject many Insureds to a series of medically unnecessary pain management injections, including, but not limited to trigger point injections with ultrasound, nerve block injections, aspirations, facet injections and PRP injections.

298.    The trigger point injections were billed to GEICO through the Pain Management Defendants typically using CPT code 20553, representing trigger point injections in 3 or more muscles.

299.    The nerve block injections were billed to GEICO through the Pain Management Defendants typically using CPT code 64418, representing injection of an anesthetic agent in a suprascapular nerve and/or CPT code 64450, representing injection of an anesthetic agent in a peripheral nerve or branch.

300.    The facet injections were billed to GEICO through the Pain Management Defendants typically using CPT code 64493, representing paravertebral facet joint injection with guidance.

301.    Like the charges for the other Fraudulent Services, the charges for the trigger point injections and pain management injections were fraudulent in that the injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the phony, boilerplate "diagnoses" and "treatment plans" that the Defendants provided during their fraudulent initial consultations and follow-up examinations.

302.    In fact, in almost every instance, Insureds were subject to trigger point and other injections on the same day they were subject to a phony initial or follow-up examination and outcome assessment test.  Additionally, patients were subject to trigger point injections, nerve block injections and joint injections on the same body part (i.e. knee) on the same day, representing pain management services well outside the standard of care.

303.    Moreover, in the claims for trigger point injections and pain management injections identified in Exhibits "1", "2", "4", "7", and "8", the charges for the injections were fraudulent in that they misrepresented the Pain Management Defendants' eligibility to collect No-Fault Benefits in the first instance because – as a result of the illegal kickback, improper financial arrangements and referral scheme described herein – they were not in compliance with relevant laws and regulations governing healthcare practice in New York

(i)    Standards for the Legitimate Use of Trigger Point Injections

304.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in

which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

305.     Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

306.     In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

307.     As a result, in a legitimate clinical setting, trigger point injections should not be administered until a patient has pain symptoms that have persisted for more than three months, and has failed or been intolerant of conservative therapies for at least one month.

308.     Furthermore, in a legitimate clinical setting, trigger point injections should not be administered more than once every two months, or more than six times in any given year.

309.     This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; (ii) a proper interval between trigger point injections is necessary to determine whether or not the initial trigger point injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

(ii)     The Medically Unnecessary Trigger Point Injections

310.     In the claims for trigger point injections identified in Exhibits "1", "2", "4", "7", and "8", the Pain Management Defendants routinely purported to administer trigger point

injections to the Insureds before the Insureds had pain symptoms that persisted for more than three months, and/or before the Insureds had failed or been intolerant of more conservative therapies for at least one month.

311.    Not surprising, as Landow is not a pain management specialist or qualified to supervise such services, the trigger point injections are routinely performed by physician assistants purportedly employed by the Pain Management Defendants.   Despite physician assistants technically being able to perform such services, physician assistants must be supervised by physicians when performing services, including pain management injections.  Upon information and belief, the physician assistants purportedly employed by the Pain Management Defendants, were not adequately supervised during the performing of pain management injections by Landow or any other medical professional purportedly employed by the Pain Management Defendants.

312.    Additionally, highlighting the fact that Landow is not a  pain management specialist or qualified to supervise pain management services, he testified he did not believe an Insured required any period of conservative therapy prior to receiving trigger point injections, which is outside the ordinary standard of care with respect to trigger point injections.

313.    The Pain Management Defendants routinely purported to provide trigger point injections within less than three months – and in some cases, within a few weeks – of the Insureds' automobile accidents, before the Insureds could possibly have failed any legitimate course of conservative treatment.

314.    For example,

    (i)    Insured DC was allegedly involved in a motor vehicle accident on July 26, 2018.   Four days later, on July 30, 2018, DC underwent an initial examination and received trigger point injections administered by Paramount.   DC received additional injections on September 4, 2018, November 5, 2018, December 3, 2018, and December 24, 2018.

(ii)   Insured TA was allegedly involved in a motor vehicle accident on August 6, 2018. One day later, on August 7, 2018, TA underwent an initial examination and received trigger point injections administered by Paramount.

(iii)   Insured FZ was allegedly involved in a motor vehicle accident on December 23, 2018. Three days later, on December 26, 2018, FK underwent an initial examination and received trigger point injections administered by Paramount. FK received an additional injection administered by Birch on February 20, 2019.

(iv)   Insured KV was allegedly involved in a motor vehicle accident on March 14, 2019. Four days later, on March 18, 2019, KV underwent an initial examination and received trigger point injections administered by Birch. KV received an additional injection administered by Eastern on July 22, 2019.

(v)   Insured OL was allegedly involved in a motor vehicle accident on May 11, 2019. Five days later, on May 16, 2019, OL underwent an initial examination and received trigger point injections administered by Birch. OL received additional injections administered by Eastern on July 11, 2019.

(vi)   Insured JC was allegedly involved in a motor vehicle accident on May 18, 2019. Five days later, on May 23, 2019, JC underwent an initial examination and received trigger point injections administered by Birch.

(vii)   Insured OM was allegedly involved in a motor vehicle accident on September 7, 2019. Four days later, on September 11, 2019, OT underwent an initial examination and received trigger point injections administered by Eastern. OM received additional injections administered by Eastern on October 14, 2019, November 1, 2019, and December 2, 2019. OM also received an additional injection administered by Macintosh on January 6, 2020.

(viii)   Insured JMER was allegedly involved in a motor vehicle accident on September 9, 2019. One day later, on September 10, 2019, JMER underwent an initial examination and received trigger point injections administered by Eastern. JMER received an additional injection on November 12, 2019.

(ix)   Insured DMN was allegedly involved in a motor vehicle accident on January 21, 2020. Six days later, on January 27, 2020, DMN underwent an initial examination and received trigger point injections administered by Macintosh.

(x)   Insured DT was allegedly involved in a motor vehicle accident on February 3, 2020. Three days later, on February 6, 2020, DT underwent an initial

examination and received trigger point injections administered by Macintosh. DT received additional injections on April 28, 2020 and May 12, 2020.

315. These are only representative examples. The Pain Management Defendants routinely purported to provide and bill for medically unnecessary trigger point injections (almost always to three or more muscles) to Insureds long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

316. As noted above, in the claims for trigger point injections identified in Exhibits "1", "2", "4", "7", and "8", the Pain Management Defendants also routinely purported to administer multiple rounds of trigger point injections to the Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

317. The Pain Management Defendants routinely purported to provide and bill for medically unnecessary rounds of trigger point injections to the Insureds within a span of weeks (almost always to three or more muscles) without having a chance for Insureds to try and fail any course of legitimate, conservative treatment.

318. The Pain Management Defendants purported to administer medically-unnecessary trigger point injections to the Insureds in the claims identified in Exhibits "1", "2", "4", "7", and "8" despite the fact that such injections – to the extent that they actually occurred – placed the Insureds at risk.

319. Even when performed correctly, the injections that the Pain Management Defendants purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, or even death.

320. To the extent that the Pain Management Defendants actually administered injections to Insureds with the frequency set forth in their billing, the Pain Management Defendants increased these risks exponentially.

321. The Pain Management Defendants' pre-determined treatment protocol, including subjecting patients to multiple rounds of trigger point injections over the course of a few weeks, before the Insureds had failed any course of legitimate, more conservative treatment, was designed and employed by the Pain Management Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections.

322. To further increase the fraudulent billing that they submitted for each round of medically unnecessary trigger point injections, the Pain Management Defendants routinely submitted a separate charge under CPT code 76942 for "ultrasound guidance" of the trigger point injections, charging $262.91 per "unit" of guidance. However, in the majority of Insureds the Pain Management Defendants routinely billed for multiple units of guidance with the trigger point injections, resulting in charges of $1,051.64 or higher.

323. The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to pre-determined fraudulent protocols and illegal kickback and financial arrangements, designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it.

324. Notably, ultrasound guidance is not required to properly administer a trigger point injection. Moreover, (i) the Pain Management Defendants virtually never appropriately

documented the use, need, or placement of the ultrasound guidance, (ii) nor were there any images included in the Pain Management Defendants' records, or any notations that images were placed into the Insureds' charts, calling into question whether ultrasound guidance was even performed in the first instance.

325.    In addition to the ultrasound guidance, to further increase the fraudulent billing that they submitted for each round of medically unnecessary trigger point injections, the Pain Management Defendants routinely submitted a separate charge of $57.26 – under CPT code 20610 – for "arthrocentesis aspiration" of a major joint.

326.    The charges under CPT code 20610 were fraudulent inasmuch as, like the underlying trigger point injection and ultrasonic guidance itself, the arthrocentesis was not medically necessary and was performed – to the extent that it was performed at all – pursuant to pre-determined fraudulent protocols and illegal kickback and financial arrangements, designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it.

327.    Like the Pain Management Defendants' charges for the other Fraudulent Services, the charges for the trigger point injections and additionally billed services on the same day were fraudulent in that they were performed – to the extent they were performed at all – pursuant to the Defendants' predetermined fraudulent treatment and billing protocols and illegal kickback and financial arrangements and referral schemes, designed solely to maximize profits without any regard for genuine patient care.

(iii)    Standards for the Legitimate Use of Pain Management Injections

328.     Generally, when a patient presents with a soft tissue injury, such as a sprain or strain, secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

329.     If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

330.     The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

331.     In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

332.     This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive pain management injections entail a degree of risk to the patient that is absent in conservative forms of treatment.

333.     In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered contemporaneously.

334.     This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft

tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

### 1. The Medically Unnecessary Pain Management Injections

335.   As set forth above, the substantial majority of the Insureds in the claims identified in Exhibits "1", "2", "4", "7", and "8" were involved in relatively minor "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

336.   As part of the fraudulent scheme, in addition to the trigger point injections identified above, the Pain Management Defendants also caused Insureds to receive multiple "nerve block" pain management injections under CPT codes 64418, resulting in a charge of $146.58 per injection, virtually always on the same day as Insureds received trigger point injections and an initial or follow-up examination and outcome assessment testing.

337.   For example, and these are only representative samples,

(i)     Insured JR was allegedly involved in a motor vehicle accident on February 26, 2018.  On June 21, 2018, Paramount caused JR to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

(ii)    Insured CB was allegedly involved in a motor vehicle accident on July 19, 2018.  On April 3, 2019, Birch caused CB to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

(iii)   Insured AR was allegedly involved in a motor vehicle accident on November 16, 2018.  On December 5, 2018, Paramount caused AR to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

(iv)    Insured DA was allegedly involved in a motor vehicle accident on November 19, 2018.  On January 9, 2019, Preferred caused DA to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

(v)     Insured JL was allegedly involved in a motor vehicle accident on January 25, 2019.  On January 15, 2020, Macintosh caused JL to receive a "nerve

block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

(vi)     Insured SM was allegedly involved in a motor vehicle accident on February 14, 2019.  On February 19, 2019, Birch caused SM to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and an initial examination.

(vii)    Insured JR was allegedly involved in a motor vehicle accident on June 30, 2019.  On January 23, 2020, Macintosh caused JR to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

(viii)   Insured RR was allegedly involved in a motor vehicle accident on July 14, 2019.  On October 2, 2019, Eastern caused RR to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

(ix)     Insured KE was allegedly involved in a motor vehicle accident on September 14, 2019.  On September 16, 2019, Eastern caused KE to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and an initial examination.

(x)      Insured OR was allegedly involved in a motor vehicle accident on November 1, 2019.  On April 27, 2020, Macintosh caused OR to receive a "nerve block" pain management injection under CPT code 64418, in addition to trigger point injections and a follow-up examination.

338.    Similarly, as part of the fraudulent scheme, in addition to the trigger point and nerve block injections identified above, the Pain Management Defendants also caused Insureds to receive multiple "nerve block" pain management injections under CPT codes 64450, resulting in a charge of $80.16 per injection, virtually always on the same day as Insureds received an initial or follow-up examination and outcome assessment testing.

339.    To the extent that the Insureds in the claims identified in Exhibits "1", "2", "4", "7", and "8" experienced any injuries at all in their minor accidents, the injuries were minor soft tissue injuries such as sprains and strains.

340.    By the time the Pain Management Defendants purported to provide pain management injections to the Insureds, the Insureds either had no presenting problems at all, or their presenting problems consisted of trivial sprains and strains that were in the process of being resolved through conservative treatment.

341.    Even so, in the claims for pain management injections identified in Exhibits "1", "2", "4", "7", and "8", the Pain Management Defendants: (i) routinely administered pain management injections to Insureds who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections; and (ii) routinely purported to administer multiple pain management injections, and multiple varieties of pain management injections, to Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

342.    The Pain Management Defendants' pre-determined treatment protocol, including subjecting patients who had not been seriously injured in their minor accidents, or who had not been injured at all, to multiple pain management injections was designed and employed by the Pain Management Defendants solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

## 2.    The Medical Unnecessary Platelet Rich Plasma Injections

343.    In addition to the other medically unnecessary pain management injections, based upon the phony, boilerplate "diagnoses" and "treatment plans" the Defendants documented, during their fraudulent initial consultations and follow-up examinations, Defendants Paramount, Preferred and Birch ("PRP Defendants") purported to subject many Insureds to a series of medically unnecessary platelet-rich plasma ("PRP") injections.

344.     As with the other Fraudulent Services, the PRP injections were provided – to the extent they were provided at all – based on the improper kickback and financial arrangements and to justify the continued Fraudulent Services and other medical services provided to Insureds where the PRP Defendants operated.

345.     The PRP Defendants billed GEICO for PRP injection under CPT code 0232T, typically resulting in charges in excess of $1,000.00 per PRP injection.

346.     Platelet-rich plasma is a blood plasma that has been enriched with platelets from a patient's own blood. The platelets purportedly contain alpha granules that are rich in several growth factors, such as platelet-derived growth factor, transforming growth factor-$\beta$, insulin-like growth factor, vascular endothelial growth factor, and epidermal growth factor, which supposedly play key roles in tissue repair mechanisms.

347.     In order to perform a platelet-rich plasma injection, the medical provider draws blood, places it into a centrifuge to separate the blood's plasma (containing the platelets) from the red blood cells, and then injects the platelets into the site of the patient's injury.

348.     As set forth above, in the claims identified in Exhibits "1" "2" and "4", virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

349.     The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all.

350.     Moreover, virtually none of the Insureds in the claims identified in Exhibits "1" "2" and "4", suffered any serious injuries at all, much less chronic tendon injuries.

351.     Even so, the PRP Defendants routinely provided medically unnecessary PRP injections to Insureds who had been involved in minor accidents – and who had not suffered any

injury more serious than a sprain or strain – months after the underlying accidents, long after the Insureds' minor sprains and strains had resolved, and despite the fact that the Insureds did not suffer from any chronic tendon injuries.

352.     Additionally, for PRP injections to be effective, typically an individual would not undergo physical therapy treatment until at least 10-14 days after the PRP injection.  However, Insureds who received PRP injections from the PRP Defendants virtually always continued with physical therapy treatment immediately after the injections.

353.     For example,

(i)      On July 12, 2017, Paramount purported to provide PRP injections to an Insured named "FM".  Thereafter, on July 17, 2017, FM continued a course of physical therapy.

(ii)     On July 28, 2017, Paramount purported to provide PRP injections to an Insured named "DR".  Thereafter, on August 1, 2017, DR continued a course of physical therapy.  Similarly, on October 4, 2017, Paramount purported to provide PRP injections to an Insured named "DR".  Thereafter, on October 6, 2017, DR continued a course of physical therapy.

(iii)    On October 21, 2018, Preferred purported to provide PRP injections to an Insured named "ZN".  Thereafter, on October 29, 2018, ZN continued a course of physical therapy.

(iv)     On October 28, 2018, Preferred purported to provide PRP injections to an Insured named "FV".  Thereafter, on November 5, 2018, FV continued a course of physical therapy.

354.     These are only representative examples. In the claims in Exhibits "1" "2" and "4",, the PRP Defendants routinely purported to provide medically unnecessary PRP injections, despite the fact that virtually none of the Insureds in the claims identified in Exhibits "1" "2" and "4", experienced any serious injuries at all, much less chronic injuries to their tendons.

**D.     The Fraudulent Billing for Independent Contractor Services**

355.     Defendants' fraudulent scheme also included submission of claims to GEICO on behalf of the PC Defendants seeking payment for services provided by independent contractors.

356.     Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

357.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).  See Exhibit "9".

358. Defendants routinely submitted charges to GEICO and other insurers for Fraudulent Services that purportedly were performed by physicians other than Landow through the PC Defendants.

359. Because in many instances Landow was not qualified to supervise or interpret the medical services being provided by the PC Defendants, many of the medical professionals working for the PC Defendants worked without any truly meaningful medical supervision by Landow.

360. The professionals, including physicians, acupuncturists and physical therapists, as well as technicians and the others utilized by the PC Defendants, worked part-time and/or followed irregular schedules, based on their own schedules, availability, and individual desires to performed services for the PC Defendants. The professionals and others often also only performed services at specific No-Fault Clinics and not on behalf of the PC Defendants at the numerous clinics where one performed services.

361. Indeed, many of these professionals, did not exclusively provide services for the PC Defendants, but also rendered services for various other professional corporations as well as owned their own professional corporations which submitted billing to GEICO.

362. The medical professionals, including physicians, acupuncturists and physical therapists who performed services for the Defendants were the listed owners and/or submitted billing as treating providers through dozens of professional corporations during the time they rendered services on behalf of the PC Defendants.

363. In fact, GEICO obtained testimony from at least one at least one medical professional who rendered services on behalf of the EDX Defendants who testified while he performed EDX services for companies, he did not always know the name of the entity through which the services were being billed.

364.    To the extent that healthcare services providers other than Landow, they were performed by physicians whom Defendants treated as independent contractors.

365.    For instance, upon information and belief, Defendants:

(i)      established an understanding with the physicians that they were independent contractors, rather than employees;

(ii)     paid no employee benefits to the physicians;

(iii)    failed to secure and maintain W-4 or I-9 forms for the physicians;

(iv)     compelled the physicians to pay for their own malpractice insurance at their own expense;

(v)      permitted the physicians to set their own schedules and days on which they desired to perform services;

(vi)     permitted the physicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

(vii)    failed to cover the physicians for either unemployment or workers' compensation benefits; and

(viii)   filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians and unlicensed technicians were independent contractors.

366.    By electing to treat the professionals and other rendering individuals as independent contractors, Defendants realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)     avoiding the need to secure any malpractice insurance; and

(vi)    avoiding claims of agency-based liability arising from work performed by the physicians.

367.    Because the physicians were independent contractors and performed the Fraudulent Services, Defendants never had any right to bill or collect New York PIP Benefits in connection with those services.

368.    Defendants billed for the Fraudulent Services as if they were provided by actual employees of Paramount to make it appear as if the services were eligible for reimbursement.

369.    Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

**E.      Landow's Failure to Practice Medicine Through the PC Defendants**

370.    N.Y. Business Corporation Law § 1507 makes clear that a physician shareholder of a medical professional corporation must be engaged in the practice of medicine through the professional corporation for it to be lawfully licensed. Section 1507 provides as follows:

> *Issuance of shares*
>
> A professional service corporation may issue shares only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation…or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued….All shares issued, agreements made, or proxies granted in violation of this section shall be void.

371.    Legislative history confirms that a medical professional corporation's putative physician-owner not only must be licensed to practice medicine but must also be engaged in the practice of medicine through the medical professional corporation.  For example, in commenting on the proposed amendment to Section 1507 in 1971, the State Education Department stated:

This bill amends the Business Corporation Law in relation to the operation of professional service corporations. While this bill allows more flexibility in the ownership and transfer of professional service corporation stock, it maintains the basic concept of restricting ownership to professionals working within the corporation.

372.    Similarly, the New York Department of State commented that:

Section 1507 currently limits issuance of shares in such corporation to persons licensed by this State to practice the profession which the corporation is authorized to practice and who so practice in such corporation or a predecessor entity.
The bill would add a third category of person eligible to receive stock, one who will practice such profession "within 30 days of the date such shares are issued."

373.    New York's Department of Health was of the same opinion, commenting that:

The bill would amend Article 15 of the Business Corporation Law pertaining to professional service corporations to allow the issuance of shares of individuals who will engage in the practice of the profession within 30 days of the date such shares are issued, in addition to those presently so engaged…. (Emphasis added.)

Copies of the memoranda are annexed hereto as Exhibit "10."

374.    Since 2016, Landow has not legitimately engaged in the practice of medicine through the PC Defendants as required by New York law.

375.    In fact, at least as of 2019, Landow testified he resided in Florida full time and could not have performed any of the medical services for the PC Defendants.

376.    Additionally, Landow does not supervise any of the treatment or services that allegedly are provided to patients of the PC Defendants. Nor does Landow train any of the medical professionals that allegedly provide medical services for the PC Defendants.

377.    Landow does not work at any of the No-Fault Clinics where the PC Defendants allegedly provide treatment and/or testing services.

378.    Notably, Landow has never been, and is, not qualified to provide and/or supervise many of the Fraudulent Services that are allegedly provided by the medical professionals associated with the PC Defendants.

379.     For example, Landow is a physician specializing in internal medicine, and has neither the training nor the medical expertise to perform; (i) EDX testing; (ii) acupuncture treatment; (iii) pain management services; and (iv) surgeries.

380.     Critically, Landow is not actually capable of: (i) performing these services that were purportedly conducted on GEICO Insureds; (ii) interpreting the results of the testing or treatment records; or (iii) supervising the services that were purportedly performed by the medical professionals working for the PC Defendants.

381.     Further highlighting Landow's failure to practice or supervise through the PC Defendants, Landow allowed numerous errors and factually inaccurate information to appear on the billing and treatment records submitted to GEICO by the Defendants.  For example, GEICO routinely received billing and treatment records that listed Vivienne Etienne, M.D. as the professional who performed the services on behalf the Defendants, when in fact, another medical professional had actually performed the services.

382.     Landow's failure and inability to practice medicine through the PC Defendants as well as his failure and/or inability to properly hire, train, or supervise the physicians who perform services billed under the name of the PC Defendants, compromises patient care and leads to excessive and/or unnecessary testing.

**III.**     **The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

383.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, bills, and treatment reports through the PC Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

384.     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants and Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were eligible to receive PIP reimbursement. In fact, as set forth herein, the Defendants and Fraudulent Services were not in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws, and therefore were not eligible to receive PIP reimbursement.

(ii)    The NF-3 forms, HCFA-1500 forms, bills, and treatment reports frequently misrepresented to GEICO that the Fraudulent Services were medically necessary and eligible for PIP reimbursement, when in fact they were not.

(iii)   The NF-3 forms, HCFA-1500 forms, bills, and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of the PC Defendants uniformly misrepresented to GEICO that Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed under New York no-fault insurance policies. In fact, Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

(v)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of the PC Defendants uniformly misrepresented to GEICO that Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed under New York no-fault insurance policies. In fact, Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the PC Defendants are nominally owned by a physician who does not actually practice through the professional corporations.

## IV.     __The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance__

385. The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

386. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

387. Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Defendants were engaged in illegal kickbacks and referrals.

388. The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

389. In addition, Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians and other professionals associated with the PC Defendants in order to prevent GEICO from discovering that the physicians and other professionals performing certain of the Fraudulent Services were not employed by the PC Defendants.

390. The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full. Much of the arbitration that the Defendants have commenced to collect on their fraudulent PIP claims was commenced in New York, seeking to collect PIP Benefits under GEICO's New York

automobile insurance policies for Fraudulent Services that they purported to provide to GEICO's New York-based Insureds.

391.     GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,900,000.00 based upon the fraudulent charges representing payments made by GEICO to Paramount.

392.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

393.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

394.     There is an actual case in controversy between GEICO and Defendants regarding more than $12,750,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

395.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services billed by the Defendants were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined, fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

396.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Defendants engaged in unlawful kickback and referral schemes in which all of the Defendants participated.

397.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

398.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were performed – to the extent they were performed at all – by independent contractors rather than by employees of the PC Defendants.

399.     The Defendants have no right to receive payment for any pending bills submitted to GEICO because the PC Defendants are nominally owned by a physician who does not actually practice through the professional corporations.

400.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Paramount has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Landow
### (Violation of RICO, 18 U.S.C. § 1962(c))

401.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

402.     Paramount is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

403.     Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Paramount's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Paramount was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Paramount; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

404.    Paramount's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Paramount, inasmuch as Paramount is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Paramount to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Paramount to the present day.

405.    Paramount is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These

inherently unlawful acts are taken by Paramount in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

406.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,280,000.00 pursuant to the fraudulent bills submitted through Paramount.

407.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Paramount and Landow**
**(Common Law Fraud)**

408.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

409.    Paramount and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Paramount seeking payment for the Fraudulent Services.

410.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to

illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Paramount; and (vi) the Fraudulent Services were performed by independent contractors.

411. Landow and Paramount intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Paramount that were not compensable under the New York and New Jersey no-fault insurance laws.

412. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,280,000.00 pursuant to the fraudulent bills submitted by the Defendants through Paramount.

413. Landow and Paramount's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

414. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Paramount and Landow**
**(Unjust Enrichment)**

415. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

416. As set forth above, Paramount and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

417. When GEICO paid the bills and charges submitted by or on behalf of Paramount for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Paramount and Landow's improper, unlawful, and/or unjust acts.

418. Paramount and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Paramount and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

419. Paramount and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

420. By reason of the above, Paramount and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $1,280,000.00.

**FIFTH CAUSE OF ACTION**
**Against Landow**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

421. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

422. Preferred is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

423. Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Preferred's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Preferred was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined,

fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Preferred; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

424. Preferred's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Preferred, inasmuch as Preferred is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Preferred to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Preferred to the present day.

425. Preferred is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Preferred in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

426. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $896,000.00 pursuant to the fraudulent bills submitted through Preferred.

427. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against Preferred and Landow**
**(Common Law Fraud)**

428. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

429. Preferred and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Preferred seeking payment for the Fraudulent Services.

430. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Preferred; and (vi) the Fraudulent Services were performed by independent contractors.

431. Landow and Preferred intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Preferred that were not compensable under the New York and New Jersey no-fault insurance laws.

432.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $896,000.00 pursuant to the fraudulent bills submitted by the Defendants through Preferred.

433.    Landow and Preferred's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

434.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Preferred and Landow**
**(Unjust Enrichment)**

435.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

436.    As set forth above, Preferred and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

437.    When GEICO paid the bills and charges submitted by or on behalf of Preferred for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Preferred and Landow's improper, unlawful, and/or unjust acts.

438.    Preferred and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Preferred and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

439.    Preferred and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

440. By reason of the above, Preferred and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $896,000.00.

### EIGHTH CAUSE OF ACTION
**Against Landow**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

441. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

442. Sovereign is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

443. Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Sovereign's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Sovereign was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Sovereign; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

444.    Sovereign's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Sovereign, inasmuch as Sovereign is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Sovereign to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Sovereign to the present day.

445.    Sovereign is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sovereign in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

446.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted through Sovereign.

447.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Sovereign and Landow**
**(Common Law Fraud)**

448.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

449.    Sovereign and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of

their submission of thousands of fraudulent charges through Sovereign seeking payment for the Fraudulent Services.

450.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Sovereign; and (vi) the Fraudulent Services were performed by independent contractors.

451.     Landow and Sovereign intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sovereign that were not compensable under the New York and New Jersey no-fault insurance laws.

452.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $150,000.00 pursuant to the fraudulent bills submitted by the Defendants through Sovereign.

453.     Landow and Sovereign's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

454.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Sovereign and Landow
### (Unjust Enrichment)

455.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

456.    As set forth above, Sovereign and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

457.    When GEICO paid the bills and charges submitted by or on behalf of Sovereign for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Sovereign and Landow's improper, unlawful, and/or unjust acts.

458.    Sovereign and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Sovereign and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

459.    Sovereign and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

460.    By reason of the above, Sovereign and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $150,000.00.

## ELEVENTH CAUSE OF ACTION
### Against Landow
### (Violation of RICO, 18 U.S.C. § 1962(c))

461.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

462.    Birch is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

463.     Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Birch's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Birch was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Birch; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

464.     Birch's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Birch, inasmuch as Birch is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Birch to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Birch to the present day.

465.    Birch is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Birch in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

466.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $212,000.00 pursuant to the fraudulent bills submitted through Birch.

467.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
**Against Birch and Landow**
**(Common Law Fraud)**

468.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

469.    Birch and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Birch seeking payment for the Fraudulent Services.

470.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to

illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Birch; and (vi) the Fraudulent Services were performed by independent contractors.

471. Landow and Birch intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Birch that were not compensable under the New York and New Jersey no-fault insurance laws.

472. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $212,000.00 pursuant to the fraudulent bills submitted by the Defendants through Birch.

473. Landow and Birch's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

474. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
#### Against Birch and Landow
#### (Unjust Enrichment)

475. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

476. As set forth above, Birch and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

477. When GEICO paid the bills and charges submitted by or on behalf of Birch for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Birch and Landow's improper, unlawful, and/or unjust acts.

478.    Birch and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Birch and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

479.    Birch and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

480.    By reason of the above, Birch and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $212,000.00.

## FOURTEEN CAUSE OF ACTION
### Against Landow
### (Violation of RICO, 18 U.S.C. § 1962(c))

481.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

482.    Spruce is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

483.    Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Spruce's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Spruce was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did

not practice through Spruce; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

484.    Spruce's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Spruce, inasmuch as Spruce is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Spruce to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Spruce to the present day.

485.    Spruce is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Spruce in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

486.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $461,000.00 pursuant to the fraudulent bills submitted through Spruce.

487.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

# FIFTEEN CAUSE OF ACTION
## Against Spruce and Landow
### (Common Law Fraud)

488.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

489.     Spruce and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Spruce seeking payment for the Fraudulent Services.

490.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Spruce; and (vi) the Fraudulent Services were performed by independent contractors.

491.     Landow and Spruce intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Spruce that were not compensable under the New York and New Jersey no-fault insurance laws.

492.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $461,000.00 pursuant to the fraudulent bills submitted by the Defendants through Spruce.

493.     Landow and Spruce's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

494.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTEEN CAUSE OF ACTION
### Against Spruce and Landow
### (Unjust Enrichment)

495.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

496.     As set forth above, Spruce and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

497.     When GEICO paid the bills and charges submitted by or on behalf of Spruce for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Spruce and Landow's improper, unlawful, and/or unjust acts.

498.     Spruce and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Spruce and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

499.     Spruce and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

500.     By reason of the above, Spruce and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $461,000.00.

## SEVENTEENTH CAUSE OF ACTION
### Against Landow
### (Violation of RICO, 18 U.S.C. § 1962(c))

501. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

502. Summit is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

503. Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Summit's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Summit was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Summit; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

504. Summit's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Summit, inasmuch as Summit is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Summit to

function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Summit to the present day.

505.     Summit is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Summit in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

506.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $85,000.00 pursuant to the fraudulent bills submitted through Summit.

507.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTEENTH CAUSE OF ACTION**
**Against Summit and Landow**
**(Common Law Fraud)**

508.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

509.     Summit and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Summit seeking payment for the Fraudulent Services.

510.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-

services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Summit; and (vi) the Fraudulent Services were performed by independent contractors.

511. Landow and Summit intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Summit that were not compensable under the New York and New Jersey no-fault insurance laws.

512. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $85,000.00 pursuant to the fraudulent bills submitted by the Defendants through Summit.

513. Landow and Summit's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

514. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Summit and Landow
### (Unjust Enrichment)

515. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

516.   As set forth above, Summit and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

517.   When GEICO paid the bills and charges submitted by or on behalf of Summit for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Summit and Landow's improper, unlawful, and/or unjust acts.

518.   Summit and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Summit and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

519.   Summit and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

520.   By reason of the above, Summit and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $85,000.00.

**TWENTIETH CAUSE OF ACTION**
**Against Landow**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

521.   GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

522.   Eastern is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

523.   Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Eastern's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Eastern was not entitled to receive under

New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Eastern; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

524.    Eastern's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Eastern, inasmuch as Eastern is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Eastern to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Eastern to the present day.

525.    Eastern is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Eastern in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

526.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $325,000.00 pursuant to the fraudulent bills submitted through Eastern.

527.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against Eastern and Landow
### (Common Law Fraud)

528.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

529.    Eastern and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Eastern seeking payment for the Fraudulent Services.

530.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Eastern; and (vi) the Fraudulent Services were performed by independent contractors.

531.    Landow and Eastern intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges

submitted through Eastern that were not compensable under the New York and New Jersey no-fault insurance laws.

532. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $325,000.00 pursuant to the fraudulent bills submitted by the Defendants through Eastern.

533. Landow and Eastern's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

534. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
### Against Eastern and Landow
### (Unjust Enrichment)

535. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

536. As set forth above, Eastern and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

537. When GEICO paid the bills and charges submitted by or on behalf of Eastern for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Eastern and Landow's improper, unlawful, and/or unjust acts.

538. Eastern and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Eastern and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

539.     Eastern and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

540.     By reason of the above, Eastern and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $325,000.00.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Landow**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

541.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

542.     Macintosh is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

543.     Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of Macintosh's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than four years seeking payments that Macintosh was not entitled to receive under New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Macintosh; and (vi) the Fraudulent Services were performed by independent contractors. The fraudulent charges and corresponding mailings submitted to GEICO

that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "8".

544.    Macintosh's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Landow has operated Macintosh, inasmuch as Macintosh is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Macintosh to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Macintosh to the present day.

545.    Macintosh is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Macintosh in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

546.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $491,000.00 pursuant to the fraudulent bills submitted through Macintosh.

547.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
### Against Macintosh and Landow
### (Common Law Fraud)

548.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

549.     Macintosh and Landow intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Macintosh seeking payment for the Fraudulent Services.

550.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; (v) Landow did not practice through Macintosh; and (vi) the Fraudulent Services were performed by independent contractors.

551.     Landow and Macintosh intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Macintosh that were not compensable under the New York and New Jersey no-fault insurance laws.

552.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $491,000.00 pursuant to the fraudulent bills submitted by the Defendants through Macintosh.

553.     Landow and Macintosh's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

554.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against Macintosh and Landow
### (Unjust Enrichment)

555.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

556.     As set forth above, Macintosh and Landow have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

557.     When GEICO paid the bills and charges submitted by or on behalf of Macintosh for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Macintosh and Landow's improper, unlawful, and/or unjust acts.

558.     Macintosh and Landow have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Macintosh and Landow voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

559.     Macintosh and Landow's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

560.     By reason of the above, Macintosh and Landow have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $491,000.00.

## FIRST CAUSE OF ACTION
### Against Landow
### (Violation of 18 U.S.C. § 1962(c))

561.     GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

562. Landow and the PC Defendants, and others not named as Defendants herein, together constitute a separate association-in-fact "enterprise" (the "Landow Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

563. At all times relevant to this Complaint, Landow was a "person" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), with Landow having an existence separate and apart from the Landow Enterprise.

564. The members of the Landow Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically: (i) Landow is the listed owner of the PC Defendants, used his license to commit fraud and participated in the direction of the fraudulent billing and implemented a fraudulent predetermined treatment protocol with assistance from the Provider Defendants, Nominal Owners, and others; (ii) Landow and the PC Defendants facilitated the submission of fraudulent bills to GEICO; (iii) the PC Defendants, with the assistance of Landow, used independent contractors to provide the Fraudulent Services, in violation of New York law; (iv) PC Defendants, with the assistance of Landow, entered into illegal kickback and referral arrangements in order to expand the number of No-Fault Clinic locations at which they could carry out the fraudulent scheme, in violation of New York law; and (vi) Landow caused the PC Defendants to act in succession in order to evade insurer investigations and to perpetrate the fraudulent scheme undetected for periods of time in order to obtain reimbursement on knowingly fraudulent services. Accordingly, by associating together to form the Landow Enterprise, the Defendants were able to accomplish their unlawful goals to an extent that would not have been possible had they acted alone or without the aid of each other – namely, carrying out a scheme to defraud of massive size

and scope, maximizing their profits, evading detection by operating as successor entities, and operating and generating profits from a total of over 20 different No-Fault Clinic locations.

565.    Landow knowingly conducted and/or participated, directly or indirectly, in the conduct of the Landow Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of bills and supporting documentation on a continuous basis for over two years seeking payments to which the Defendants were not entitled under the No-Fault Laws. Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341:

> (i)     Landow devised, executed, and/or knowingly assisted in carrying out a scheme and artifice to defraud GEICO of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the healthcare claims for payment;

> (ii)    Pursuant to the scheme, Landow submitted, or caused to be submitted, to GEICO, through the PC Defendants, false and fraudulent claims and information in which Landow concealed that the charges submitted were for services provided pursuant to a fraudulent predetermined treatment protocol;

> (iii)   Pursuant to the scheme, Landow submitted, or caused to be submitted, to GEICO, through the PC Defendants, false and fraudulent claims and information in which Landow falsely represented that the testing they administered was medically necessary for the care of Insureds;

> (iv)    Pursuant to the scheme, Landow submitted, or caused to be submitted, to GEICO, through the PC Defendants, false and fraudulent claims and information in which Landow falsely represented that the services that the PC Defendants billed for had been administered by employees, when in fact the services were administered by independent contractors;

(v)     Pursuant to the scheme, Landow submitted, or caused to be submitted, to GEICO, through the PC Defendants, false and fraudulent claims and information in which the Defendants falsely represented that the PC Defendants properly operated under the New York Business Corporation Law, when in fact, Landow did not render services through the PC Defendants;

(vi)    Pursuant to the scheme, Landow submitted, or caused to be submitted, to GEICO, through the PC Defendants, false and fraudulent claims and information in which the Defendants concealed the fact that the PC Defendants, with the assistance of the Landow, had illegal kickback and referral arrangements with referring healthcare providers and/or clinic controllers at numerous No-Fault Clinics throughout the New York metropolitan area; and

(vii)   For the purpose of executing this scheme and artifice to defraud, Landow submitted, or caused to be submitted, such false and fraudulent claims and information to GEICO by use of the mail caused GEICO to make payments for said fraudulent claims.

566.    The Landow Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges.  The predicate acts of mail fraud are the regular way in which the Defendants operate the Landow Enterprise and acts of mail fraud therefore are essential for the Landow Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud, continuous changing of TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the PC Defendants to the present day.

567.    A list of various mailings constituting a substantial number of the requisite predicate acts is annexed hereto as Exhibits "1" - "8." Each such mailing was made in furtherance of the mail fraud scheme.

568.    The Landow Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by employing and coordinating many professionals

and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO), by creating and maintaining patient files and other records, by negotiating and executing various facility lease agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments, by facilitating payments stemming from the illegal kickback and referral arrangements, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

569. The Landow Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO (and likely other automobile insurers). These inherently unlawful acts are taken by the Landow Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO (and likely other automobile insurers) through fraudulent no-fault billing.

570. GEICO has been injured in their business and property by reason of the above-described conduct in that they have paid at least $3,900,000.00 pursuant to the fraudulent bills submitted in furtherance of the Landow Enterprise.

571. By reason of their injuries, Landow are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## JURY DEMAND

572. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against the Defendants, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Paramount has no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,280,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Paramount and Landow, for compensatory damages in an amount to be determined at trial but in excess of $1,280,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action against Paramount and Landow, for compensatory damages in an amount to be determined at trial but in excess of $1,280,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $896,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Preferred and Landow, for compensatory damages in an amount to be determined at trial but in excess of $896,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.	On the Seventh Cause of Action against Preferred and Landow, for compensatory damages in an amount to be determined at trial but in excess of $896,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.	On the Eighth Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $150,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.	On the Ninth Cause of Action against Sovereign and Landow, for compensatory damages in an amount to be determined at trial but in excess of $150,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

J.	On the Tenth Cause of Action against Sovereign and Landow, for compensatory damages in an amount to be determined at trial but in excess of $150,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.	On the Eleventh Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $212,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.	On the Twelfth Cause of Action against Birch and Landow, for compensatory damages in an amount to be determined at trial but in excess of $212,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.	On the Thirteenth Cause of Action against Birch and Landow, for compensatory damages in an amount to be determined at trial but in excess of $212,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $461,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against Spruce and Landow, for compensatory damages in an amount to be determined at trial but in excess of $461,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Spruce and Landow, for compensatory damages in an amount to be determined at trial but in excess of $461,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $85,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R.      On the Eighteenth Cause of Action against Summit and Landow, for compensatory damages in an amount to be determined at trial but in excess of $85,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Summit and Landow, for compensatory damages in an amount to be determined at trial but in excess of $85,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $325,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U.      On the Twenty-First Cause of Action against Eastern and Landow, for compensatory damages in an amount to be determined at trial but in excess of $325,000.00,

together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

V.    On the Twenty-Second Cause of Action against Eastern and Landow, for compensatory damages in an amount to be determined at trial but in excess of $325,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W.    On the Twenty-Third Cause of Action against Landow, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $491,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.    On the Twenty-Fourth Cause of Action against Macintosh and Landow, for compensatory damages in an amount to be determined at trial but in excess of $491,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Y.    On the Twenty-Fifth Cause of Action against Macintosh and Landow, for compensatory damages in an amount to be determined at trial but in excess of $491,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Z.    On the Twenty-Sixth Cause of Action against Landow and the PC Defendants, for compensatory damages in an amount to be determined at trial but in excess of $3,900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: March 18, 2021

RIVKIN RADLER LLP

By: _/s/ Barry I. Levy_
      Barry I. Levy, Esq.
      Michael Sirignano, Esq.
      Blythe C. Miller, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*